HARRIMAN *et al. vs.* THE FIRST BRYAN BAPTIST CHURCH.

1. A church incorporated by the superior court cannot as a corporation engage in the sale of tickets to the public for an excursion on board a steamer which the church has chartered for the occasion. Expenses incurred with a view to profit, and profits lost, cannot be recovered from the owners of the vessel on their failure to make the stipulated voyage. Excursions, as matter of trade or business with the public, are not within the means or ends for which the church was incorporated. The measure of recovery in a suit by the church against the owners is the amount paid as hire for the vessel.

2. When a vessel is chartered for an excursion, the price paid, and a receipt given, and the writing is silent as to the capacity of the vessel, and she is overloaded, and by reason of the overloading, together with the state of the weather, the excursion fails, parol evidence is admissible to prove that the price was fixed with reference to the carrying capacity for twelve hundred passengers, it ap-

## SEPTEMBER TERM, 1879. 187

Harriman *et al* vs. The First Bryan Baptist Church.

pearing that only about seven hundred went aboard, and that her government license restricted her to five hundred.

3. Parol evidence is admissible to show for whom an agent failing to disclose his principal acted in making a contract, though it involve proof of the ownership of a vessel; but reputation at the port is not evidence of ownership, nor is information which the witness acquired by an examination of entries in the custom-house, neither the entries nor a copy of them being produced.

4. When two are sued by attachment on an alleged joint contract, the evidence must establish a joint liability, or the plaintiff cannot recover.

Corporations. *Ultra vires.* Damages. Evidence. Contracts. Principal and agent. Before Judge HARDEN. City Court of Savannah. November Term, 1878.

On June 20, 1878, the First Bryan Baptist Church, as a body corporate under the laws of Georgia, sued out an attachment against I. N. Harriman and I. W. Fellows for $650.00, returnable to the city court of Savannah. A levy was made upon a steamboat known as the City of Bridgeton, the property replevied by the defendants, and the papers returned to court. The declaration filed made, in brief, this case: On May 25, 1878, the defendants, being the owners of the above named steamboat, in consideration of $260.00 paid to them, entered into a written contract with the plaintiff, a body corporate, etc., whereby they chartered to it said steamer to make an excursion on the 10th of the following June, from the city of Savannah to the city of Beaufort. The plaintiff, for the purpose of raising money to pay the debts due for the building of its church-edifice, endeavored to make such excursion profitable, and therefore went to much expense in printing tickets, advertising said excursion, the hiring of music and the purchase of ice, amounting to $18.50. Plaintiff advertised and represented said excursion as to be made to Beaufort, and by these means sold tickets to the amount of $575.00. At the appointed time the plaintiff and the excursionists were ready to proceed on said excursion to Beaufort, but the defend-

12

ants would not allow said steamboat to make the trip, and wholly refused to carry out their contract. Plaintiff was therefore compelled to refund to the ticket-holders the amount paid for tickets. By reason of the premises plaintiff says it was damaged $650.00.

By an amendment plaintiff alleged that defendant fraudulently represented to it that said steamboat was allowed under the law of the United States to carry fifteen hundred passengers on excursions; that relying upon these representations plaintiff chartered said boat and paid to the defendants therefor the sum of $260.00; that at the appointed time seven hundred persons who had purchased tickets went on board said steamer, but said boat had not under the law the carrying capacity represented by the defendants, but was only permitted to carry ninety-four cabin passengers and two hundred and six deck passengers; that said defendants would not allow said steamboat to go on said excursion, and refused to perform their contract, to the damage of plaintiff $650.00.

Harriman pleaded the general issue and that the contract set forth in the declaration, the basis of the plaintiff's action, was *ultra vires.*

Subsequently "the defendants," by an amendment to "their said pleas," denied the corporate existence of the plaintiff.

The evidence presented in substance the following facts :.

On May 25, 1878, the following contract was entered into :

"Received of First Bryan Baptist Church $50 00 on account of charter of the steamer City of Bridgeton for June 10th, next, to make an excursion from Savannah to Beaufort, S. C., leaving Savannah about 7 A.M. of that day, and returning about 8 P M. of same day. Whole amount of charter $260.00.

[Signed]                    J. S. LAWRENCE, *Manager.*"

Receipts were introduced to show the payment of the balance of the $260.00.

The plaintiff was incorporated at the January term, 1867,

of Chatham superior court, on a petition to be made a "body politic under the name of the First Bryan Baptist Church, for the more efficient worship of God, the preservation and perpetuation of said church, and the better control and regulation of the affairs and property thereof." The order of incorporation was in the usual form.

Rohn testified to the following facts: Am treasurer of plaintiff. Did not go on the excursion because the boat left me on wharf. No money received from the sale of tickets has ever been paid into the treasury of the church. When we were on the wharf the purser said that he was instructed to collect $1.00 from every excursionist over three hundred. Whilst we were discussing this charge the boat pushed off. I think there were about seven hundred people on the boat.

Houston testified to the following facts: Am pastor of plaintiff. Saw agent of steamer to ascertain what boat could be chartered for to go on excursion to be given by church to Beaufort. Mr. Lawrence, the agent, said that he had two boats, the David Clark and the City of Bridgeton; that the plaintiff could have the former for $125.00 and the latter for $260.00; that the former could only carry four hundred passengers, whilst the latter could take twelve hundred. On reporting this conversation to the plaintiff I was directed to charter the Bridgeton. The excursion was given for the purpose of raising money to pay off a debt contracted by the plaintiff for the building of a new brick church. Whilst we were discussing in the office on the wharf the charge made by the purser of $1.00 for each excursionist over three hundred, the boat pushed off and left us. She left about 8 A.M. or a little thereafter. I think there were about seven hundred and fifty people on her. I went aboard myself and tried to keep the people in order. We sold tickets to everybody who wanted them, whole tickets for $1.00 and half tickets for 50 cents. About two-thirds of the people on board held whole tickets. The captain told me we were over-crowding the boat, and he

could not allow it. I replied that the agent informed me that the boat could carry twelve hundred. I then left the boat, being called by one of the deacons to see the purser about the extra charge put on us.

Simms testified to following facts: Am a trustee of the church. When arguing the question as to the extra charge made by the purser, the boat pushed off and left me. I. W. Fellows and I. N. Harriman are the owners of the City of Bridgeton. I found this out at the custom-house from the register of the vessel. I know that they are the owners of the vessel. I heard it under the bluff in conversation with parties. It was common report under the bluff that they were the owners. Don't know who I had the conversation with. Am certain I had it. Am positive I saw the register of the vessel in the custom-house. I went to see it to find out the owners for the purposes of this suit. There were on board at the time she left about eight-tenths grown people.

Lewis, sworn: Was one of the committee appointed by the plaintiff for this excursion. Do not think any persons went on board the steamer without tickets. After we started the captain told the committee that it was not safe to go on the excursion because the boat was overloaded and the weather threatening. It was a bright, sunshiny day. He said he would go down as far as he could, and when he rang the gong the committee must come up on the upper deck, and he would let us know whether he would turn back or not. When we came up the boat had already turned back. Saw no rough water. Asked the captain if we could not go the inside route. He replied that he did not think it safe to go across Caliboga sound, but would try the inside route. We started in the direction of the inside route, but after going four or five miles, ran aground. In a short time thereafter a storm came on. We got off in about an hour or an hour and a half. We reached Savannah about 2 o'clock p. m. There were two or three fights on board. One woman cut another with a razor, and a man was knocked

down with a stool.   I sold tickets to the amount of $45.00, which I refunded to the holders on the boat.   I refunded because the excursionists threatened to throw me and the balance of the committee overboard unless we returned the money.   When the boat turned back the crowd became entirely unmanageable, and the committee were compelled to seek safety in the captain's room.   They pressed so hard against the door to this room that it was broken in.

Nickerson, sworn :  I know where Caliboga sound is. Crossed it in 1871 at the end of every month for one year and three months.   The captain said it was too rough to cross the sound.   Have crossed it in steamers Water Lily, Pilot Boy and Hancock, all smaller boats than the Bridgeton, in rougher weather than this was.   The captain said that the committee had charge until the time was up.   After we turned back I told them we could go the inside route. Had been that route in the Pilot Boy and the Hancock, and think the Bridgeton could have done so.   We were aground one hour and a half or two hours.   Soon after we ran aground a storm came up and it " blew pretty stiff."  · Some of the people got their money back ;  plenty have not.   Mine was not returned to me.   I made the effort to get it back on the boat, but the crowd was too thick.

Other evidence of a cumulative character was introduced for the plaintiff, not deemed material here.

The defendants moved for a non-suit because the contract disclosed by the testimony was *ultra vires*.   The motion was overruled, and defendants excepted.

The defendants introduced Fleetwood, the captain of the Bridgeton, who testified, in brief, that he had been for twenty years a seaman and a pilot ;  that he had been acting constantly as a pilot on Caliboga sound for the last twelve years ;  that to have crossed the sound on the day of the excursion, loaded as the boat was, would have resulted in the loss of lives, and probably of the boat also ;  that the license of the boat only allows her to carry five hundred passengers, and when he thought this number was on board

he pushed off; that there may have been more on board, but he had no means of accurately judging: that the storm which came up would have caught the boat in the middle of the sound, where she and all on board would probably have been lost.

This witness went into details showing the facts upon which he based his judgment.

During his examination he stated that he had " the papers of the vessel" in his pocket, but declined to produce them without being served with a *subpœna duces tecum.* He stated that I. W. Fellows was the owner; that he knew this from the papers in his possession; that when he became captain he recognized him as owner; that he never had seen him, but took his orders from Lawrence, the general manager; that he did not know Fellows as owner except through the papers in his possession.

The jury found for the plaintiff $478.75 as follows: $260.00 original charter money, and $218.75 damages.

The defendants moved for a new trial upon the following grounds, to-wit:

1. Because the verdict was contrary to the law, the charge of the court, and the evidence.

2. Because the court refused to order a non-suit on the ground that the contract was *ultra vires.*

3. Because the court overruled the objection to the testimony of Houston, that defendants had contracted to carry twelve hundred persons for the sum of two hundred and fifty dollars (when it was distinctly stated that the contract was in writing), and allowed the witness to testify as to the number of persons which defendants said could be carried on said boat.

4. Because the court allowed Simms to testify as to who were the owners of the steamer City of Bridgeton after the witness had sworn that he had seen the register of the said vessel in the custom-house at Savannah, and had inspected it for the purpose of ascertaining who the owners of said steamer were.

5. Because the court ruled that the parol testimony of Simms as to the notorious ownership of the vessel by the defendants could be received after proof that a written instrument was in existence, and accessible to the diligence of the plaintiff, and that the defendants having come into court and pleaded in said cause, admitted thereby that they were the owners.

6. Because the court charged the jury that if they found who the owners were from the pleadings, including the attachment record, and they believed them to be owners from the proofs and pleadings, they should so find; and that if there was no denial of ownership by the defendants, and defendants had pleaded, this was an admission of ownership.

7. Because the court charged that plaintiffs could recover as damages the two hundred and sixty dollars ($260.00) paid defendants for hire of boat, and that they could find this under the second count of plaintiff's declaration.

8. Because the court charged that the contract between the parties was not *ultra vires* as to the said plaintiff; that it had a right to make said contract and sue for a breach of the same.

The motion was overruled and defendants excepted.

J. J. ABRAMS; R. E. LESTER, for plaintiffs in error, cited on *ultra vires*, 53 *Ga.*, 625; Code, §§1676, 1677; 4 Wheat., 636; 2 Kent, 299; 2 Cranch, 127; 1 Peters, 544; 13 How., 81; Ang. and Ames on Corp., §§251, 256, 258, 260, 271; 3 B. & Ald., 12; 2 Cowen, 699; 2 Conn., 568; 73 E. C. L., 75; 13 Peters, 519; 1 Dil. on Mun. Corp., §381; Cooley's Con. Lim., 394, 395. On evidence, 54 *Ga.*, 289; 55 *Ib.*, 376, 403; 56 *Ib.*, 32; 59 *Ib.*, 122; 60 *Ib.*, 387; Chit. on Con., 107; *Ocean Steam. Co. vs. Krauss*, Aug. term, 1878; Code, §3762.

JOHN M. GUERARD, for defendant, cited on *ultra vires*, 45 *Ga.*, 41; 43 *Ib.*, 54; 52 *Ib.*, 276; 54 *Ib.*, 387; Field on

Corp., §§248, 249, 263, 267, 272, 273; 82 E. C. L., 397, 412, 449; 14 Penn. State, 8.   On evidence, Code, §§2757, 3781, 3791; 5 Otto, 95; 23 *Ga.*, 43; 61 *Ib.*, 225; 6 Wall., 18–30; 41 E. C. L, 278; 61 *Ib.*, 447.   On estoppel by replevying, Code, §2699; 12 *Ga.*, 56; 57 *Ib.*, 449.   On charge, 18 *Ga.*, 495.

Bleckley, Justice.

1. Perhaps the most important question is as to the power of the corporation to make the contract.   "A corporation is an artificial person created by law for specific purposes, the limit of whose existence, powers and liabilities is fixed by the act of incorporation, usually called its charter."   Code, §1670.   "All corporations have the right to sue and be sued, to have and use a common seal, to make by-laws, binding on their own members, not inconsistent with the laws of the state and of the United States, to receive donations by gift or will, to purchase and hold such property, real and personal, as is necessary to the purpose of their organization, and to do all such acts as are necessary for the legitimate execution of this purpose "   *Ib.*, §1679.   " The power to create corporations in this state rests in the general assembly, and the courts, by whom all charters must be granted."   *Ib.*, §1674.   " A private corporation for any purpose whatever, except banking or insurance, may be created in this state by complying with the following provisions : The persons desiring the charter shall file in the office of the clerk of the superior court of the county in which they desire to transact business a petition or declaration, specifying the objects of their association, and the particular business they propose to carry on, together with the corporate name," etc.   " Corporations thus created may exercise all the powers necessary to the purpose of their organization, but shall make no contract or purchase, or hold any property of any kind, except such as is necessary in legitimately carrying into effect such purpose, or for securing debts due to the company."   *Ib.*, §1675, ¶¶ 1, 5.

With these statutory provisions, together with others not necessary to be cited, in force, the First Bryan Baptist Church was incorporated by the superior court of Chatham county, on the 12th of February, 1867, on a petition or declaration which specified as the objects of the association, " the more efficient worship of God, the preservation and perpetuation of said church, and the better control and regulation of the affairs and property thereof." The erection of a church-edifice appropriate to the congregation is certainly within this enumeration, as well as within the general scope of the powers which should appertain to a religious society, whether incorporated or unincorporated. And the same may be said of raising money to pay for the erection. This last was the purpose which moved the First Bryan Baptist Church to undertake to conduct an excursion from Savannah to Beaufort, and to charter a steamer for the occasion ; there was a debt outstanding, contracted for the erection of a new brick church, and the corporation wished to raise money with which to discharge it. The purpose was a worthy and laudable one, and, as we have said, was within the charter; but the power to raise money for a proper object does not carry with it unlimited discretion as to the means of raising it. Every corporation must act according to its nature; a trading corporation must trade, a manufacturing corporation must manufacture, a banking corporation must bank, a transportation corporation must carry, and a religious corporation must preach, teach, minister to spiritual edification, and promote works of mercy and benevolence. A church incorporated as such, cannot engage, even for a day, in merchandizing, or in spinning or weaving, or in banking or broking, or in transporting freight or passengers. It must derive its income, not from the conduct of any worldly business, but from such property as it may happen to own, and from voluntary contributions. However urgent its needs for money, it cannot rent a farm to make a crop of corn or cotton, nor a store to buy and sell goods, nor a livery stable to let out horses and carriages,

nor can it hire a vessel to transport the public upon rivers or the ocean.    To charter a steamer, and sell tickets to the public for an excursion, is to enter into the responsibilities and hazards of a busines, for gain and profit, not mentioned or hinted at in " the more efficient worship of God, the preservation and perpetuation of said church, and the better control and regulation of the property thereof."    The adventure, it seems, required a considerable outlay of church revenue; two hundred and sixty dollars for the vessel, and eighteen dollars and fifty cents for the necessary printing, advertising, ice, and music.    This capital was understood to be staked on the success of the "committee" in selling tickets; but perhaps it was not thought of that each ticket sold would, if good for anything, amount to a contract on the part of the church to have the buyer transported to Beaufort and back, and that a breach of the contract would subject the church to an action on each and every ticket.    What unseemly commotion actually arose on account of the failure of the expedition may be gathered from the evidence ; a committeeman on board was threatened with a most profane form of immersion, two or three fights occurred, a man was knocked down with a stool, and one woman cut another with a razor.    That church members, in their personal individual capacity, have the right, if they think fit, to get up an excursion, as matter of business, for the improvement of the church finances, to charter carriages, ships, or railroad trains for the purpose, and to sell tickets to the public, there is no doubt; but it seems to us that an artificial entity which the law creates under the name of a corporation can do nothing of the kind without the authority to do it is specially granted.    We are looking at transactions which involve business dealings with the public, and not merely at an excursion undertaken by the congregation for devotional exercises, celebrations, or recreation.    It may be that the corporate resources might be drawn upon for an excusion of this character, and the corporate functions of the church be enlisted in heading and

conducting it. Possibly, also, it would be competent for a church, as a corporation, to hire a vessel to convey from place to place a company sent out to solicit contributions for the supply of its wants, or to swell its exchequer. In this country, all support of religion being voluntary, there can be no question that solicitation is within the scope of the powers which every religious corporation enjoys. If a church in Savannah wanted to employ a vessel to carry a party over to Beaufort to collect funds by contribution, perhaps it might so do. The present case does not require us to settle this question. What was attempted was to conduct a day's carrying business with the public, and to employ a vessel for this purpose. The church was incorporated for no such end, and as means to the ends for which the corporation was created, we think the enterprise was neither necessary nor appropriate. The contract was therefore *ultra vires*. It follows that there can be no recovery in this action for the expenses incurred in preparing for the excursion, nor for the profits lost on account of the failure of the voyage. The recovery must be limited to the amount paid as hire for the vessel, with interest upon it. If the case should be otherwise made out, the declaration is sufficient to uphold a recovery to this extent. It sets forth all the material facts, and though it is framed upon a wrong legal theory, that of the validity of the alleged contract, it may be treated as good in respect to an implied contract to refund the money. The statutory requisites of a declaration are only that it shall fully, plainly and distinctly set forth the plaintiff's charge or demand. Code, §3332. It can easily be gathered from the declaration that the plaintiff seeks to recover back the money paid for hire, and more besides; and while the declaration is not good for more, it is good for that much. I am aware that this is a very liberal view in favor of the pleading, and it can be justified only on the ground that with us in Georgia pleading has been cut down to a simple narrative of facts—nothing beyond is essential. To suffer a recovery on the ground of the nullity of the alleged contract rather than on

the ground of the breach of it, is to treat the action as one for money had and received to the plaintiff's use, and this is certainly going very far, but we think the step may be taken.

2. There was no error in admitting parol evidence that the price of the vessel for hire was fixed with reference to a carrying capacity of twelve hundred passengers, though there was a written agreement. The matter under investigation was, what caused the failure of the voyage, and there was evidence that the failure was due in part to overloading the vessel. This overloading was the act of the plaintiff, and the defendants had no right to take advantage of it as an excuse if the plaintiff was not in fault. If the vessel was hired as one that could carry twelve hundred, there was no fault in burdening it with seven hundred or seven hundred and fifty. The written agreement was altogether silent as to capacity ; and it is provided in section 3803 of the Code that, "if the writing does not purport to contain all the stipulations of the contract, parol evidence is admissible to prove other portions thereof not inconsistent with the writing."

3. The agent with whom the agreement was made, and who signed the writing as "manager," did not disclose his principal or principals. While it was competent to prove by parol who these were, it was obviously not competent to do it by reputation at the port, or by what the witness heard "under the bluff," or by entries which he read in the custom-house. If the entries were evidence at all, they, or a copy of them, would be better and higher evidence than a recital of them by the witness from memory. There can be no doubt that the ownership of a vessel cannot be proved by reputation or mere hearsay.

4. The attachment was sued out against I. N. Harriman and I. W. Fellows, and they replevied the property and were declared against as joint debtors. We think the evidence must establish a joint liability, or there can be no recovery.

Judgment reversed.