[S. F. No. 11037. In Bank.—October 22, 1924.]

ROMAN CATHOLIC ARCHBISHOP OF SAN FRANCISCO (a Corporation Sole), Petitioner, v. INDUSTRIAL ACCIDENT COMMISSION et al., Respondents.

[1] WORKMEN'S COMPENSATION ACT — EMPLOYER AND EMPLOYEE — INDEPENDENT CONTRACTOR — QUESTION OF FACT — FINDINGS. — Whether a workman is an employee within the Workmen's Compensation Act or an independent contractor is a question of fact upon which the judgment of the Industrial Accident Commission is conclusive where the facts are in dispute, and it becomes a question of law only when but one inference can reasonably be drawn from the facts.

[2] ID.—CONTROL OF WORK—EVIDENCE.—In this proceeding to review an order of the Industrial Accident Commission awarding compensation for personal injuries, it is held that the evidence supports an inference that control or power of control of the work was retained by the alleged employer and that the finding that the applicant was an employee, instead of an independent contractor, is sustained by the evidence.

[3] ID.—EMPLOYMENT—CASUAL EMPLOYMENT AND IN COURSE OF BUSINESS.—An employment must be both casual and not in the course of business of the employer to be excluded under section 8 (c) of the Workmen's Compensation Act; and in order to deny compensation it is not sufficient to establish the casual nature of the

---

1. Independent contractor as workman or "employee" within meaning of Workmen's Compensation Act, notes, Ann. Cas. 1916B, 793; L. R. A. 1917D, 148; L. R. A. 1918F, 206. See, also, 28 R. C. L. 762.

3. What constitutes casual employment within the meaning of Workmen's Compensation Act, notes, Ann. Cas. 1918B, 709; L. R. A. 1917D, 147, 151; L. R. A. 1918F, 215. See, also, 28 R. C. L. 766.

employment, but it must also be established that it is outside of the business of the employer.

[4] ID.—INDEPENDENT CONTRACTOR—BURDEN OF PROOF.—Prior to the amendment of 1917 of the Workmen's Compensation Act the burden was on the employee to show that he was not an independent contractor and that the work performed arose out of and was in the course of his employer's business; but under section 19 (d) the burden is squarely placed on the employer to show either that the applicant was an independent contractor or that the work done by him was not in the course of the employer's trade, business, profession, or occupation.

[5] EVIDENCE—JUDICIAL NOTICE—PRIVATE CORPORATIONS.—Courts will take judicial notice of the existence of private corporations created by public law.

[6] CORPORATIONS—RELIGIOUS, SOCIAL, AND BENEVOLENT CORPORATIONS —RIGHTS, DUTIES, AND POWERS.—A corporation formed under title XII of the Civil Code (religious, social, and benevolent corporations) has civil rights and duties, and its powers, like those of other corporations, are construed with reference to the object of the corporate existence.

[7] ID.—CORPORATE POWERS—SPIRITUAL SIDE OF CHURCH.—The corporate powers of a religious corporation are entirely distinct from the spiritual side of the church, and in order that a religious society be recognized by law, it must be shown that it is capable of making contracts, accepting benefits, and of suing and being sued.

[8] ID.—JUDICIAL NOTICE—CIVIL RIGHTS AND DUTIES.—The existence of a corporation sole being shown, the courts take judicial notice that the office has civil rights and duties, but courts do not take judicial notice of the nature and scope of such civil rights and duties.

[9] WORKMEN'S COMPENSATION ACT—REPAIR OF CHURCH—SERVICES INCLUDED IN ACT.—Where it is shown that an applicant for compensation for injuries under the Workmen's Compensation Act sustained while repairing a chapel was not an independent contractor, the fact that the title to the property is held by a corporation sole, but the management and control is committed to a pastor, who ordered the work and who acts under the appointment of the former, and that the purpose of such chapel is to hold religious services therein about twice a month, is not sufficient to take the case out of the provisions of said act.

[10] ID. — REPAIR OF CHAPEL — OWNERSHIP OF CORPORATION SOLE — CIVIL RIGHTS AND DUTIES — AFFIRMANCE OF AWARD. — In a proceeding in *certiorari* to review an award of the Industrial Accident Commission of compensation for injuries sustained in repairing a

5.  See 10 **Cal. Jur.** 699; 7 **R. C. L.** 104.

chapel used for religious purposes, the title to which is in the archbishop as a corporation sole, where the petitioner fails to allege and prove that his civil rights and duties as a corporation sole do not include the repairs in question, the award must be affirmed.

(1) Workmen's Compensation Act, p. 123, sec. 127. (2) Workmen's Compensation Act, p. 115, sec. 114. (3) Workmen's Compensation Act, p. 51, sec. 43. (4) Workmen's Compensation Act, p. 115, sec. 112. (5) 23 C. J., p. 158, sec. 1980. (6) 34 Cyc., p. 1139 (1926 Anno.). (7) 34 Cyc., p. 1139 (1926 Anno.). (8) 23 C. J., p. 159, sec. 1980 (1926 Anno.). (9) Workmen's Compensation Act, p. 46, sec. 36 (1926 Anno.). (10) Workmen's Compensation Act, p. 125, sec. 131 (1926 Anno.).

PROCEEDINGS in Certiorari to review an order of the Industrial Accident Commission awarding compensation for personal injuries. Award affirmed.

The facts are stated in the opinion of the court.

R. P. Wisecarver for Petitioner.

A. E. Graupner and Warren H. Pillsbury for Respondents.

LAWLOR, J.—An award was made by the . Industrial Accident Commission in favor of Charles Laton Eubanks, whom we shall designate the applicant, and against the Roman Catholic Archbishop of San Francisco, a corporation sole, hereinafter referred to as petitioner. The award was in the amount of $583.24, and the additional sum of $20.83 per week, beginning with the twenty-eighth day of December, 1922, and until the termination of the disability of the applicant or the further order of the Commission.

The applicant applied to the Commission for the adjustment of his claim for compensation based on an injury sustained by him while he was reshingling a roof. It appears he is a carpenter by trade and was engaged by the Reverend Albert R. Bandini, a pastor of the Roman Catholic Church in the country territory which extended five miles out of the city of Stockton. The headquarters of the pastor were at St. Michael's Church, some distance from a chapel at Linden upon which the work was performed. The applicant claimed he worked one full day—the afternoon of the day he was

engaged and the forenoon of the following day. Shortly after 12 o'clock of the second day, in preparing to descend from the roof, the footing gave way and he fell about twenty feet to the ground striking on his feet. The injuries he sustained were fractured bones in both feet and some injury to the muscles and ligaments in the left lower part of the back. It was found that he is totally disabled. The pastor was named as defendant in the application before the Industrial Accident Commission. Findings and an award were filed on October 19, 1922, at the first hearing, in effect as follows: That the applicant sustained injury occurring in the course of and arising out of his employment, and that the work of reshingling the roof of the chapel was not contemplated to be completed within ten working days, the employment was not casual, and an award of $270.79 was made against the pastor, with the weekly sum of $20.83 until the termination of the disability or the further order of the Commission. A petition for rehearing was granted by the Commission, based on the contentions that the employment was casual, that the applicant was an independent contractor, and that there was newly discovered evidence. On December 6, 1922, the petitioner was joined as a proper party to the proceeding before the Commission upon the ground that he held the legal title to the property upon which the applicant was employed at the time of his injury. New evidence was received by the Commission whose decision was filed on April 18, 1923, in which it was found that "The employer was at said time a religious corporation sole and the employee at the time of said injuries was engaged in the repair of the church building owned by said employer at Linden, California, and operated by it for the carrying out of the purposes of the organization of said employer among its parishioners at that point and such repair was therefore in the course of the business of the employer, and both the employer and employee were subject to the provisions of the Workmen's Compensation, Insurance and Safety Act of 1917." Including the amount of the award accruing between the first and second decision a final award was made against the petitioner for $583.24, and the further sum of $20.83 per week. On May 15, 1923, the second decision was also amended by the addition of the following: "The work contemplated upon which the

employee was engaged at the time of his injury was to have been completed in not exceeding ten working days and at a labor cost of less than $100.00, and was after the injury to the applicant actually completed within such period and cost and the applicant's employment was therefore casual. . . . Defendant Rev. Fr. Bandini was at and about the time of the aforesaid injury, and the contract of employment, the agent of the employer, but was not himself the employer and is neither a necessary nor proper party to this proceeding.''

The record before the Commission upon which the findings, amended and additional findings, and amended award were based shows that the applicant, on June 6, 1922, went to the Free Bureau of Employment in the city of Stockton and there secured a shingling job at the said Roman Catholic chapel at Linden. The pastor discussed with applicant the proposed job of reshingling and after the terms were agreed upon he drove him out to the chapel. The applicant started work shortly after the noon hour; he testified he was to be paid eight dollars per day; that it was a repair job and the entire roof of the church was to be reshingled and the batten board and the ridge board were to be fixed; that the shingles were already at the church and supplied by the pastor; that the job called for 25,000 shingles; that he supplied his own tools but that the ladders and scaffolds were already there; that he understood the pastor was bossing the job; that nothing was said about the total cost of the work, nor concerning the number of days he was to be employed, nor about retaining him on the job until it was completed, but he understood his employment was simply to be until he finished: ''Q. You were not supposed to complete the job out there? A. Not that I know of. I thought he may fire me like he did the first man. He started me off on the work. I was to roof the church in the regular way. Q. When were you to be paid—every day or once a week? A. Once a week, that is when I expected it''; that the old shingles had been taken off half the roof and that he was to take off the other half himself; that about one-half day's work of shingling had been done by his predecessor; that the pastor told him there were about 25,000 shingles on the place and more to come; that he could put on about 3,000 in one day; that it would take one day to clear off the .

shingles, two days to fix the ridge board and the cross, the total number of days being about twelve; that a man identified as Ed. Welsh, whom he did not employ, helped him the first day by carrying the "shingles up so they would be handy"; that the pastor did not suggest how he was to do the shingling; that he was to shingle the church in "the regular way"; that the pastor did not tell him at which gauge to lay the shingles; that the ridge board and cross were to be fixed and that from another source, referring to Ed. Welsh, he got the information that the cross was to be taken off and a new one put on, but he expected the pastor to come to Linden to tell him what to do about the ridge board and the cross; that he would have stopped work if he was ready to fix the ridge board and the cross if the pastor had not come; that when Ed. Welsh came on the first day to tear off the old shingles, the applicant told him it was a bad idea because it would leave part of the roof uncovered if it rained, so he suggested that Ed. Welsh might carry up the shingles, and that a carpenter works five and one-half days per week at the average pay of eight dollars per day.

The pastor testified: "I asked the State Employment Bureau for a shingler and the gentleman in charge told me after a few days that he had a man with this qualification, so I went down and had a talk with Mr. Eubanks; I asked him if he would take the job of reshingling the roof; he said he had sufficient experience to handle it. I asked him, 'How much do you want?' and he said, 'One dollar per hour.' I told him this place was far removed from my headquarters or my residence and I would leave him there and that he could come back to Stockton in the evening or stay there if he could find a place. Nothing definite was said about his working eight hours, or ten hours, or twelve hours, only I made it plain to him that he was at liberty to work as many hours as he wanted to at the price of one dollar per hour. . . . I was at Linden when Mr. Eubanks started work; I may have been around for a quarter or half an hour and I told him to go ahead, and I told him I would not see him for a few days, that I had no occasion to go to Linden. I told him, 'If you want any money, I will advance you some' "; that while the applicant was at the hospital after the accident he asked him if he needed any

money to which he replied, "No," and that "I said I owed him some money and he said he worked eight hours and I gave him eight dollars. Mr. Jeffry: Q. Was anything said by you to Mr. Eubanks about fixing the cross, or about other matters? A. There was some trouble about how the top of the roof should come together. The present arrangement seems to be old-fashioned. Now, there is another way and I told Mr. Eubanks to go ahead and fix that and other little problems that would come up. Q. What can you state about this man he spoke of assisting him on that job? A. Mr. Welsh, and some other men of the parish, had volunteered to tear off the old shingles so to leave a clear field for Mr. Eubanks for his particular job. They volunteered to do this, to tear off the old shingles and Mr. Welsh showed up on the job Tuesday morning, or the day of the injury, and he undertook to take off some of the shingles"; that tearing off these old shingles was not in the original agreement with applicant; that he did not fire the first man, he simply quit of his own accord because he could not do the work; that he did not expressly reserve the right to fire applicant at will; that he expected him to finish the job, but if upon an occasion of visiting Linden in the next few days he had found him, instead of on the roof, playing checkers with the village blacksmith, he might have felt himself entitled to break the contract; that he would not have fired applicant if he were laying the shingles improperly because he would not have known whether they were being laid correctly or not, and that when applicant suggested that the shingles already on should be taken off and put on properly he said, "I noticed they looked very bad, but I thought that after all it wouldn't matter, that very few tourists pass that way, and it would not matter to leave the shingles as they were." In support of the additional finding on rehearing that the work was casual, the following testimony appears:

G. A. Walker testified that he estimated the job at $75; that it would take about seven days to finish the work; and that it would have taken a couple of hours to replace the ridge board and the same length of time to fix the cross. William Hansen, the carpenter who finished the job after applicant was injured, testified that it took two persons two days and a half to complete the work, one hour to fix the

cross, two hours to take off the old shingles and two hours to replace the ridge board, and that he and his assistant could each lay about 6,000 shingles per day.

The petition for a writ of review is based upon the grounds that the award of the Commission was without and in excess of its jurisdiction, that the evidence does not support the award and that the order and decision are unreasonable. It is contended that the employment of applicant was casual, the cost of the work being under $100 and the job being of less than ten days' duration, that said employment was that of an independent contractor, no direction as to the manner of doing the work having been given and no restriction placed upon him as to the time to work, and that "the casual repairing of the church building is not in the 'course of the business' of petitioner as that term is used in the compensation act," the proof only showing that the title to the chapel is in the Roman Catholic Archbishop of San Francisco, a corporation sole, that religious services peculiar to the Roman Catholic denomination are had in the chapel, and there being no evidence that such building is a business property or business premises within the meaning of the compensation act.

1. When the award was made against the pastor the Commission found that the services were not casual and later when the proceeding was dismissed as to him and an award made against petitioner it was found the services were casual. In view of this and that the evidence is sufficient to sustain the latter finding it will not be necessary to pursue the point further.

[1] 2. The next point is whether the applicant was an independent contractor or an employee.

It was held in *Flickenger* v. *Industrial Acc. Com.,* 181 Cal. 425 [19 A. L. R. 1150, 184 Pac. 851], that the definition of an independent contractor contained in the amendment of the act in 1917 (Stats. 1917, p. 831) did not restrict or enlarge the meaning of the term; and hence the status is determined by rules used before the creation of the Industrial Accident Commission in ordinary actions at law. "Whether a workman is an employee within the Workmen's Compensation Act or an independent contractor is a question of fact upon which the judgment of the Industrial Commission is conclusive where the facts are in dispute, and

becomes a question of law only when but one inference can reasonably be drawn from the facts." (*Federal Mining & Smelting Co.* v. *Thomas* (Okl.), 225 Pac. 967.) It was said in *Western Pac. R. R. Co.* v. *Industrial Acc. Com.*, 193 Cal. 413 [224 Pac. 754] : "It is the rule that where from the evidence two opposing inferences may be drawn, that inference which is accepted by the Commission must be sustained if there is evidence in the record to support it and if it is a reasonable inference to be drawn from that evidence. (*Eastman* v. *Industrial Acc. Com.*, 186 Cal. 587, 589 [200 Pac. 17] ; *Polar Ice etc. Co.* v. *Mulray*, 67 Ind. App. 270 [119 N. E. 149])." (See, also, *Tartar* v. *Industrial Acc. Com.*, 191 Cal. 703 [218 Pac. 39] ; *Employers' Liability Assur. Corp.* v. *Industrial Acc. Com.*, 182 Cal. 612 [187 Pac. 42].)

[2]   Upon the evidence above cited we cannot escape the conclusion that the facts reasonably justify the finding that the applicant was an employee. As to the material factor of control or power of control an inference that the power to control was retained by the pastor would find support in the evidence. The applicant testified he was told to do the work in "the regular way," that he should place the shingles at the top of the roof according to the modern method, and that he should decide any little problems that came up. When the applicant suggested that the shingles put on by his predecessor should be taken off and put on properly the pastor told him they should be left on, that it did not matter if they were not placed correctly. He also testified that he thought he might be "fired," thereby showing that as far as he was concerned he did not suppose he was doing the work independent of any control; he understood the pastor was bossing the job, and expected to be given instructions as to what he should do with the cross and the ridge board. The cases of *Pryor* v. *Industrial Acc. Com.*, 186 Cal. 169 [198 Pac. 1045], *Western Indemnity Co.* v. *Pillsbury*, 172 Cal. 807 [159 Pac. 721], *Fidelity & Deposit Co.* v. *Brush*, 176 Cal. 448 [168 Pac. 890], and *Connolly* v. *Industrial Acc. Com.*, 173 Cal. 405 [160 Pac. 239], are cited to the point that in applying the test of control the distinction between an order and a suggestion is to be observed, and it is urged that the foregoing testimony would not justify an inference that it was obligatory upon the applicant to follow directions. It is true it is not necessary to show that an

independent contractor has an office or business in which he hires assistants (*Prince* v. *Schwartz*, 190 App. Div. 820 [180 N. Y. Supp. 703]), or that the work undertaken was within his calling (*Roberts* v. *Industrial Acc. Com.*, 52 Cal. App. 31 [197 Pac. 978], hearing in supreme court denied). The fact that the applicant applied to an employment bureau for work is some evidence he did not hold himself out as an independent contractor, but was seeking employment as an employee, and this undisputed fact also tends to support his testimony that he was under the control and direction of the pastor in doing the work.

Any conflict in the testimony of the pastor and the applicant must be resolved on the side of the findings. The testimony varies in several particulars. For instance, the applicant stated he was employed by the day, that he understood he could be discharged at any time, and that the pastor was "bossing" the job. The pastor, on the other hand, stated that the applicant was to be paid by the hour, that he hired him for the job, that he expected him to finish it, that he could work as many hours in the day as he chose, that he did not understand he could discharge the applicant, and that he told him he could not be at the chapel while the shingling was being done. He also stated he would not know how to direct the work of shingling and that he made suggestions but gave no orders. The finding of the Commission cannot be disturbed (*Dearborn* v. *Industrial Acc. Com.*, 187 Cal. 591 [203 Pac. 112]; *Great Western Power Co.* v. *Industrial Acc. Com.*, 191 Cal. 724 [218 Pac. 1009]; *Myers* v. *Industrial Acc. Com.*, 191 Cal. 673 [218 Pac. 11]).

3. The third contention of petitioner is that "there was absolutely no evidence to indicate that any business operation was carried on in this church or that your petitioner carried on any business of any character either in this church or elsewhere. The only evidence is that the title of the church is held in the Roman Catholic Archbishop of San Francisco, a corporation sole, and that religious services peculiar to the Catholic denomination are had in the church. There is no evidence in the record indicating that the church building was a business property or business premises or in any wise connected with business."

It is urged on behalf of petitioner that the finding of the Commission that the church building "operated by it [the Roman Catholic Church] for the carrying out of the purposes of the organization of said employer among its parishioners . . . and such repair was therefore in the course of the business of the employer" is not a finding that "the holding of church services was a 'business' or that the owning of a title to a church property is a business; and that there is no testimony that the church building was a 'business premises' or that any 'business' was transacted in connection with it either by petitioner or any other person and no testimony whatsoever that petitioner was engaged in any business either in this church building or elsewhere." In other words, it is contended that the finding does not support the award because it does not state that the church was operated as a business or that the church building was a business premises or business property and that the evidence would not support such a finding if it had been made. It is also urged: "Certainly if the owning of property for investment is not a business, then the owning of a church by a religious organization for purposes of meeting there and worshiping is not a business as that term is used in the compensation act. Religious worship is the very antithesis of business as the term 'business' is understood. 'Business' applies in its very nature to a holding of oneself out for commercial transactions. Unless there is the commercial element involved it is not what is ordinarily known as 'business.' . . . A church in which no business is carried on is not a business premises or property and it was just such property that the legislature intended to exclude by providing that casual employees were excluded unless they were doing work on businss premises or business property."

Respondent contends that the term, "trade business, profession or occupation of the employer," as used in section 8 (c) is "to be given a broad significance. It is not limited to business operation, in the sense of industrial affairs or businesses conducted for private profit. . . . The definition of the term contained in section 8 (c) of the Compensation Act also shows a very strong intent to give the term broader significance than that of recognized industrial occupations. The statutory definition extends the phrase to 'any undertaking . . . actually engaged in with

some degree of regularity.' The intent is that all injured workmen are to receive their compensation if injured in the ordinary course of operation of an enterprise, occupation or profession, industrial or non-industrial, actually carried on by the employer with some degree of permanency. The business side of the Archbishop's office is as permanent an institution as anything which can be imagined and the repair of the many parochial and mission churches, schools, etc., of which title vested in the Archbishop is a regular recurring and frequent affair of some magnitude, so that workmen engaged in such occupations should not be removed from the protection of the Workmen's Compensation Act. . . . The California Workmen's Compensation Act does not exempt from its operation religious, philanthropic, eleemosynary, etc., organizations as such. All organizations employing labor, outside of farm labor and household domestic service, are within the Act without regard to the nature of the activity carried on. A church, hospital, cemetery or orphan asylum must pay wages to all workmen hired by it. It is equally subject to the duty of insuring such workmen under the Workmen's Compensation Act. If the legislature intended any exemption because of the religious character of petitioner's service to the community, it would have conferred such exemption in express language. Instead, it has defined, in sec. 8 (c) the term 'trade, business, profession or occupation' as including 'any undertaking actually engaged in with some degree of regularity' without limitation. . . . The term 'profession' is primarily to identify the three learned professions of the clergy, the lawyer and the physician. The preservation of church property, renewing of roofs, etc., is just as incidental to the carrying on of the professional activities as is the renewing of the roof of the factory for a business activity. A church cannot carry on its professional services adequately without buildings, and the upkeep, maintenance, and repair of such buildings is incidental to and a part of the carrying on of its professional activities.''

[3] It is admitted that an employment must be both casual and not in the course of the business of the employer to be excluded under section 8 (c). That is, in order to deny compensation it is not sufficient to establish the casual nature of the employment but it must also be established

that it is outside of the business of the employer. (*Maryland Casualty Co.* v. *Pillsbury*, 172 Cal. 748 [158 Pac. 1031]; *London & Lancashire Guarantee etc. Co.* v. *Industrial Acc. Com.*, 173 Cal. 642 [161 Pac. 2]; *Walker* v. *Industrial Acc. Com.*, 177 Cal. 737 [L. R. A. 1918F, 212, 171 Pac. 954].)

Section 8 (c) of the act is as follows: " . . . The phrase 'course of the trade, business, profession or occupation of his employer' shall be taken to include all services tending toward the preservation, maintenance or operation of the business, business premises or business property of the employer. The words 'trade, business, profession or occupation of his employer' shall be taken to include any undertaking actually engaged in by him with some degree of regularity, the trade name, articles of incorporation or principal business of the employer to the contrary notwithstanding."

Prior to this amendment of the act in 1917, this state accepted the majority American view that neither construction nor repair work is in the course of an employer's business unless he has made it so by customarily engaging in such work. (*Maryland Casualty Co.* v. *Pillsbury*, 172 Cal. 748 [158 Pac. 1031]; *La Grande Laundry Co.* v. *Pillsbury*, 173 Cal. 777 [161 Pac. 988]; *Walker* v. *Industrial Acc. Com.*, 177 Cal. 737 [L. R. A. 1918F, 212, 171 Pac. 954]; *Holbrook* v. *Olympia Hotel Co.*, 200 Mich. 597 [166 N. W. 876]; *Marsh* v. *Groner*, 258 Pa. 473 [L. R. A. 1918F, 213, 102 Atl. 127]; *Adam* v. *Musson*, 37 Ill. App. 501; *State ex rel. Lennon* v. *District Court of Douglas County*, 138 Minn. 103 [164 N. W. 366]; *Solomon* v. *Bonis*, 181 App. Div. 672 [167 N. Y. Supp. 676]; *Geller* v. *Republic Novelty Works*, 180 App. Div. 762 [168 N. Y. Supp. 263].) We cite the following adjudications by the Commission: *Trenholm* v. *Hough*, 1 Cal. I. A. C. Dec. 260; *Castelotti* v. *McDonnell*, 1 Cal. I. A. C. Dec. 351; *Augustine* v. *Cotter*, 2 Cal. I. A. C. Dec. 59; *Brockman* v. *Sheridan*, 2 Cal. I. A. C. Dec. 986; *Sutton* v. *Rabinowitz*, 5 Cal. I. A. C. Dec. 29. In *Holbrook* v. *Olympia Hotel Co.*, *supra*, it was held that if the owner of a hotel occasionally employs someone to paint and decorate the rooms such work would not come within the meaning of the word "business" in the compensation act, though it is usual to have work of that nature done from time to time. Even in the acts

which classify the employments as hazardous and include therein the construction, repair or demolition of buildings, if the employer does not carry on any such occupation but incidentally employs someone to do that kind of work he will not be liable though the incidental work is performed on premises where a hazardous business is carried on. (*Bargey* v. *Massaro Macaroni Co.*, 218 N. Y. 410 [113 N. E. 407]; *Uphoff* v. *Ind. Bd.*, 271 Ill. 312 [Ann. Cas. 1917D, 1, L. R. A. 1916E, 329, 111 N. E. 128].) But if the employer customarily does the necessary repairs and alterations by a staff of carpenters regularly employed for that purpose by a department store whose business is not classified as hazardous, he is held to be carrying on a hazardous business as a part of his principal business (*Alterman* v. *A. I. Namm & Son*, 190 App. Div. 76 [179 N. Y. Supp. 584]).

In 1917 the California act was amended (Stats. 1917, p. 835) as above set forth and repair work on business premises or business property and any undertaking actually engaged in with some degree of regularity come within the course of the trade, business, profession, or occupation of the employer. There are no cases directly in point but in *Globe Indemnity Co.* v. *Industrial Acc. Com.*, 45 Cal. App. 328 [187 Pac. 452], it was held that carpenter work on silos to be used on a dairy farm is within the business of dairy farming, it being shown the employers elected to bring themselves within the act. In *Rissman* v. *Industrial Acc. Com.*, 190 Cal. 619 [213 Pac. 991], it was conceded by the parties and found by the Commission that the renovating of two houses for the purposes of sale was not in the employers' business. *Dearborn* v. *Industrial Acc. Com.*, 187 Cal. 591 [203 Pac. 112], involved a job of carpentry in the erection of a dwelling-house for the occupancy of the relatives of the owner. The question whether the accident arose out of and was in the course of the owner's business, which was that of farming, is not discussed in the opinion, although the Commission found in favor of the owner on those points. The award was based on the ground the work was not casual. According to two other decisions—*Lauzier* v. *Industrial Acc. Com.*, 43 Cal. App. 725 [185 Pac. 870], and *Ford* v. *Industrial Acc. Com.*, 53 Cal. App. 542 [200 Pac. 667]— the making of repairs necessary and incidental to the upkeep of four small frame houses, in the one case, and a flat in the other,

which the owners let for hire, is not a business within the contemplation of the compensation act.

We have examined the law in other jurisdictions with reference to the question whether the trade, business, profession, or occupation includes charitable, educational, religious, philanthropic, or eleemosynary institutions and have found that in most of the compensation acts such institutions are not in terms expressly excluded from the operation thereof. There are only two, however, Illinois and Pennsylvania, which expressly include such institutions. (Rev. Stats. Ill. 1917, 1450; Pa. Laws 1915, 736.) On the other hand, the states of Idaho and Georgia expressly exclude charitable organizations and institutions from the operation of their respective acts. (Ga. Laws, 1920; Idaho Laws, 1917.) A number of the acts are elective, and include within their operation only those employments in which from three to sixteen employees are regularly employed. It may be that in states where the number of employees determines whether the employer comes within the act nonprofit organizations, if employing the statutory number, would not be excluded. The industries embraced in several of the acts are enumerated and classified as extrahazardous or hazardous. There are a number of acts which expressly apply only to industrial or profitable undertakings or businesses, as, for instance, Colorado, Kansas, Maryland, New York, West Virginia, Idaho, Hawaii, Nebraska, and, possibly, Washington, Ohio, and Oregon. For example, the New York statute provides that "employment" includes employment only in a trade, business, or occupation carried on by the employer for pecuniary gain, and the West Virginia act provides that all persons, firms, associations, and corporations regularly employing other persons for profit, or for the purpose of carrying on any form of industry or business, are employers. In *Roberts* v. *Ottawa*, 101 Kan. 228 [165 Pac. 869], it was held that a city constructing a sewer, not being engaged in a gainful enterprise, is not within the Kansas act. In *Mullen* v. *Little*, 186 App. Div. 169 [173 N. Y. Supp. 578], it was held that the harvesting of ice by a farmer for farm purposes, and not as a business or for pecuniary gain, is not within the act of that state. The term "gain or profit," as used in the statutes, means pecuniary gain. (*Ray* v. *School District of Lincoln,* 105

Neb. 456 [181 N. W. 140]; *Allen* v. *State,* 173 App. Div. 455 [160 N. Y. Supp. 85]; *Redfern* v. *Eby,* 102 Kan. 484 [170 Pac. 800].) The word "business" is held to have a popular meaning and a permanent and regular occupation whose sole object is gain will not be regarded as "business" unless it is popularly so regarded. (*Bargewell* v. *Daniel,* 98 L. T. R. 257; *Kelly* v. *Buchanan,* 13 Compensation L. R. 729, 47 Ir. L. T.; *McCann* v. *McDonnell,* note to *Kelly* v. *Buchanan, supra; State ex rel. Lennon* v. *District Court of Douglas County,* 138 Minn. 103 [164 N. W. 366].) In *Marsh* v. *Groner,* 258 Pa. 473, 478 [L. R. A. 1918F, 213, 102 Atl. 127], the definition in Webster's dictionary is adopted—that is to say, business is defined as "some particular occupation or employment habitually engaged in for a livelihood or gain." (*Gray* v. *Sedgwick Co.,* 101 Kan. 195 [L. R. A. 1918F, 182, 165 Pac. 867]; *State* v. *City of Lawrence,* 101 Kan. 225 [165 Pac. 826].)

In the state of the record we do not find it necessary to pass on the question whether the expression in section 8 (c), "business, business premises or business property," would include "services tending toward the preservation, maintenance or operation" of church property, or whether it is an "undertaking actually engaged in with some degree of regularity . . . the principal business of the employer to the contrary notwithstanding."

The act as amended in 1917 also covered the rule of the burden of proof and the rule of liberal construction.

Section 19 (d) is as follows: "The burden of proof lies upon the party holding the affirmative of the issue. The following are affirmative defenses, and the burden of proof shall rest upon the employer to establish them: (1) That an injured person claiming to be an employee is an independent contractor or otherwise excluded from the protection of this act, where there is proof that such injured person was at the time of his injury actually performing service for the alleged employer." Under this section it will be observed that if a workman at the time of the injury is actually performing service for the alleged employer, so far as the burden of proof is concerned, the relationship of employer and employee is to be assumed.

Section 69 is as follows: "(a) Whenever this act, or any part or section thereof, is interpreted by a court, it shall be

liberally construed by such court with the purpose of extending the benefits of the act for the protection of persons injured in the course of their employment. . . . ''

[4] Prior to the amendment of 1917 the burden was on the employee to show that he was not an independent contractor and that the work performed arose out of and was in the course of his employer's business. But under section 19 (d) the burden is squarely placed on the employer to show either that the applicant was an independent contractor or that the work done by him was not in the course of the employer's trade, business, profession, or occupation. That is to say, it was incumbent on petitioner to establish by evidence either that the applicant was an independent, contractor or that the casual repair of the roof made under the direction of the pastor, petitioner's appointee in charge of the chapel, was not in the course of his trade, business, profession, or occupation as an archbishop, a corporation sole.

Petitioner contends that ''there is no need of taking judicial notice of any facts. The facts appear affirmatively and . . . show that the commission has no jurisdiction. . . . There is absolutely no proof that the Archbishop has any business office and even if we assume that he has there is an entire lack of proof that his business office had anything to do with this church. It does appear affirmatively, however, . . . that this work was being done by the local parish through its local priest, Father Bandini, and it was not until this case was on rehearing before the Industrial Accident Commission that the Archbishop knew anything about it. The affairs of the individual church are carried on by the parishioners and the Archbishop is not therefore engaged in business merely because the parishioners in a certain parish desire to repair their church.''

Respondents contend that ''this court knows through its judicial knowledge that petitioner is the local head of a religious institution of large magnitude. Title is in petitioner as corporation sole of a considerable number of buildings, grounds and establishments. . . . The upkeep of all buildings within the diocese, used by the Catholic church for religious purposes, involves business details and business practices of considerable extent and places such matters of maintenance and upkeep in the same category as the man-

agement of investment properties. Petitioner maintains a
business office to look after these business details."

[5]  Courts will take judicial notice of the existence of private corporations created by public law.  (15 R. C. L. 1117;
11 Fletcher on Private Corporations, 584–587; Civ. Code,
tit. XII, secs. 593–602.)  [6]  A corporation formed under
title XII of the Civil Code has civil rights and duties and
its powers, like those of other corporations, are construed
with reference to the object of the corporate existence.
(*Harriman* v. *Church,* 63 Ga. 186 [36 Am. Rep. 117].)  Section 602 of the Civil Code provides, in part: "Whenever
the rules, regulations, or discipline of any religious denomination, society, or church so require, for the administration
of the temporalities thereof, and the management of the
estate and property thereof, it shall be lawful for the bishop
. . . to become a sole corporation, in the manner prescribed
in this title, as nearly as may be, and with all the powers
and duties, and for the uses and purposes in this title provided
for religious incorporations. . . . Every corporation sole
shall, however, for the purposes of the trust, have power to
contract in the same manner and to the same extent as a
natural person, and may sue and be sued, . . . and shall have
authority . . . to buy . . . and in every way deal in real and
personal property in the same manner that a natural person
may. . . . "  [7]  Such powers are entirely distinct from
the spiritual side of the church, and in order that a religious
society be recognized by law it must be shown that it is
capable of making contracts, accepting benefits, and of suing
and being sued.  (*Baxter* v. *McDonnell,* 155 N. Y. 83 [40
L. R. A. 670, 49 N. E. 667].)  The record shows that the
Commission instituted proceedings against petitioner as a
corporation sole and that he did not deny such capacity;
it is therefore an established fact in the case.  (11 Fletcher
on Private Corporations, 580.)  [8]  The existence of a
corporation sole being shown, the courts take judicial
notice that the office has civil rights and duties but courts
do not take judicial notice of the nature and scope of such
civil rights and duties.  (*Baxter* v. *McDonnell, supra;* 15
R. C. L. 1126, 1127.)  What the nature of the civil rights
and duties is was not alleged and has not been established
by proof.  This it was necessary to do.  In the above case
it was held that judicial notice could not be taken of the

civil rights and duties, although they were alleged and proved, because the capacity as a corporation sole had not been alleged.

[9] It having been shown that the applicant was not an independent contractor the only evidence petitioner can rely on to prove that the services of the applicant are excluded by the act is that given by the pastor that petitioner is a corporation sole, holding the legal title to the chapel, the management and control of which is committed to the pastor, who acts under the appointment of petitioner, and that the purpose of such chapel is to hold religious services therein about twice a month. This showing is not sufficient under the rule of proof prescribed by the statute. It is earnestly contended that petitioner does not have the management and control of the chapel but that the pastor who ordered the work done was alone responsible for it, and that petitioner had no knowledge of the repairs until after the rehearing was granted by the Commission. It is to be gathered from the arguments of petitioner's counsel that it could have been shown it was no part of petitioner's temporal duties to directly or indirectly manage or repair the church buildings in his diocese, that this duty was delegated to the parish priest in each particular parish and that he was in no way responsible for such repairs. And it was stated that if an award be made against petitioner it will be assessed back against the parish and by it paid. But such contentions and statements of fact cannot take the place of allegation and proof. It is conceivable that if these matters had been presented the Commission would have held the pastor liable. In reply to a question by the court counsel for respondents offered to stipulate as to matters of evidence, but the offer was not acted upon. It was stated in the oral argument on behalf of petitioner: "If anybody is holden the Archbishop will consent an award may be made against him."

[10] Petitioner having failed to allege and prove that his civil rights and duties as a corporation sole do not include the repairs in question, the award must be affirmed.

In deciding that petitioner failed to show that the service did not come within the act it is not to be assumed, as already indicated, we have reached a conclusion on the question whether a church building is a "business, business premises or business property," or whether the repair thereof

tends "toward the preservation, maintenance, or operation of the business, business premises or business property" of petitioner, or whether it is an undertaking actually engaged in with some degree of regularity. The award is affirmed solely on the ground that petitioner has not, in contemplation of section 19 (d), shown that the service rendered by applicant is excluded from the operation of the act.

The suggestion has been made that if the legislature intended by the amendment of 1917 to include church repairs in the terms "business, business premises or business property" it would have so expressly provided. This may be so, and it is apparent that if this had been done the construction of the act would be attended with less difficulty. However, this is a matter for the determination of the legislature.

The award is affirmed.

Lennon, J., Richards, J., Shenk, J., Seawell, J., and Waste, J., concurred.

Rehearing denied.

All the Justices concurred.