[Civ. No. 2054. Fifth Dist. July 14, 1975.]

MARY ROSEANNA STEVENS et al., Plaintiffs and Respondents, v.
ROMAN CATHOLIC BISHOP OF FRESNO,
Defendant and Appellant.

COUNSEL

Dawson, Gillaspy & Ninnis, Stanley H. Tibbs and William S. Dawson for Defendant and Appellant.

Irwin & Thuesen, Donald C. Thuesen and Donald H. Glasrud for Plaintiffs and Respondents.

OPINION

FRANSON, J.—This is a wrongful death action by the heirs of Clifford L. Stevens and Robert W. Stevens, who died as a result of injuries sustained in a collision between their automobile and one driven by Fr.

Copentipy, a missionary Catholic priest from Bayonne, France. The plaintiffs sued Fr. Copentipy and the Roman Catholic Bishop of Fresno, a corporation sole, hereinafter "Bishop of Fresno," the latter on the basis of an alleged principal-agent relationship. At trial Fr. Copentipy stipulated to liability and the case went to the jury on the issues of the liability of the Bishop of Fresno, and damages. The jury returned substantial verdicts in favor of the plaintiffs and against Fr. Copentipy and the Bishop of Fresno. The motion of the bishop for a new trial and for a judgment notwithstanding the verdict was denied. The bishop has appealed.

### STATEMENT OF FACTS

For a number of years prior to the events in question, the Catholic Bishop of the Diocese of Bayonne, France, had sent missionary priests to this country for the purpose of ministering to the religious, family and social needs of Basque Catholics living in the Western United States and to preserve their longstanding Catholic heritage. The missionary priest Fr. Copentipy, arrived in the United States in April 1970 to replace his predecessor, Fr. Challet.

While his duties called for him to minister to Basque Catholics in all of the Western United States, Fr. Copentipy took up residence in the Diocese of Fresno. Prior to his arrival, the Bishop of Fresno wrote a letter to the United States government confirming that Fr. Copentipy had been requested to work in the Western United States under the direction of the Bishop of Fresno, with headquarters at the Diocese of Fresno.

On October 11, 1970, as Fr. Copentipy was driving his car back to Fresno after a visit with a Catholic Basque family in Madera, an accident occurred in which Fr. Copentipy's car collided with a car in which Clifford Stevens and Robert Stevens were riding. Both Stevens men were killed. A Basque sheepherder who was riding with Fr. Copentipy apparently also was killed.

Dr. Noonan, a professor of law at Boalt Hall, testified for respondents as an expert witness regarding the effect of Canon Law on the relationship between Fr. Copentipy and the Bishop of Fresno.

Msgr. Mahoney, Chancellor of the Fresno Diocese, testified on behalf of the Bishop of Fresno as an expert witness regarding Canon Law, and as to the relationship between Fr. Copentipy and the Bishop of Fresno.

## DISCUSSION

Appellant's contention that Dr. Noonan was not qualified to testify as an expert on Canon Law is without merit. A person is qualified to testify as an expert if he has special knowledge, skill, experience, training or education sufficient to qualify him as an expert on the subject to which his testimony relates. (Evid. Code, § 720.) ■ The qualification of a witness to testify as an expert is a matter within the sound discretion of the trial court and where there is no showing of a manifest abuse of such discretion the ruling will not be disturbed on appeal. (*Pfingsten* v. *Westenhaver,* 39 Cal.2d 12, 20 [244 P.2d 395].)

Dr. Noonan testified that he was a professor of law at the University of California at Berkeley. He attended Harvard College and obtained a Ph.D. degree in philosophy at the Catholic University of America. The subject of his doctoral thesis was "The Canonical and Moral Treatment of Usury." A good half of this thesis involved the research and study of Canon Law. Following completion of his doctoral work, Professor Noonan obtained an LL.B. degree from Harvard Law School. After employment with the United States government and five years in the private practice of law in Boston, Dr. Noonan joined the law faculty at Notre Dame Law School where he taught for approximately five and one-half years. During this period he researched and wrote a book on the subject of the Catholic doctrine on contraception which was published in 1967. The research for this book involved a study and understanding of the legislative system of Canon Law, i.e., how rules of Canon Law are promulgated and the system of authority which makes those rules operative for members of the Catholic Church. Upon leaving Notre Dame Law School, Professor Noonan became a law professor at the University of California School of Law. In this capacity, he taught a course on Canon Law for six years. During this period, he edited and contributed to a book dealing with Canon Law as it applies to the subjects of abortion, marriage and lawyers in the courts of the Roman Curia.

Dr. Noonan is a member of the Catholic faith. The Vatican appointed him as an advisor to the Papal Commission on the Family. He has also been a member of the Board of Governors of the Canon Law Society of America, which is the professional association of Canonists in the United States. He was a member of the Due-Process Committee of the Canon Law Society of America, which was concerned with procedures within the Church in controversial cases. Dr. Noonan has previously consulted

as an expert with various ecclesiastical bodies in connection with abortion where the competence required was a mixture of civil and Canonical law. He has also acted as a consulting expert on the subject of Canon Law to a hospital run by a religious order.

Obviously, Dr. Noonan was qualified to testify as an expert on Canon Law.

Appellant next argues that because the Canon Law relates only to the ecclesiastical relationships within the Catholic Church it is irrelevant to the issue of agency under California law. This argument also is without merit. Evidence Code section 210 declares that evidence is relevant if it has any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action. Dr. Noonan testified that Canon Law is the law of the Catholic Church and is binding upon all Catholics including a French missionary priest working in the United States, and bishops in the United States. He also referred to certain Papal Decrees which are part of the Canon Law, and which he stated define the relationship between missionary priests and local bishops. These portions of the Canon Law and Papal Decrees were in effect at the time the accident occurred.

The by-laws and internal rules and regulations of religious organizations have been held to be relevant to the existence of a principal-agent relationship between various church bodies and religious workers. (*Malloy* v. *Fong*, 37 Cal.2d 356, 367-368 [232 P.2d 241] [evidence of the nation-wide organization of the Presbyterian denomination]; *Roman Catholic Archbishop* v. *Superior Court*, 15 Cal.App.3d 405, 409-410 [93 Cal.Rptr. 338] [Canon Law of Catholic Church]; *Miller* v. *International Church*, 225 Cal.App.2d 243, 244-246 [37 Cal.Rptr. 309] [church's corporate by-laws; "Ministers' Code of Ethics"]; *Vind* v. *Asamblea Apostolica, Christo Jesus,* 148 Cal.App.2d 597, 600-601 [307 P.2d 85] (testimony as to "general laws and rights" of the Church; corporate by-laws).)

Such evidence may be received in the form of expert testimony. (*Roman Catholic Archbishop* v. *Superior Court, supra,* 15 Cal.App.3d at p. 409; *Vind* v. *Asamblea Apostolica, Christo Jesus, supra,* 148 Cal.App.2d at p. 600.)

▆ The trial court properly received Dr. Noonan's testimony regarding Canon Law as it related to the relationship in fact between Fr. Copentipy and the Bishop of Fresno.

We turn now to the basic issue: Is there substantial evidence to support the jury's implied findings that Fr. Copentipy was the agent of the Bishop of Fresno and acting within the scope of the agency at the time of the accident? We hold that there is.

■ Whether an agency exists is a question of fact to be determined from the circumstances of each case. (*Thayer* v. *Pacific Elec. Ry. Co.,* 55 Cal.2d 430, 438 [11 Cal.Rptr. 560, 360 P.2d 56].) If conflicting inferences reasonably may be drawn from the evidence, the determination of the jury will be upheld on appeal even though the strongest evidence suggests a contrary determination. (*Tieberg* v. *Unemployment Ins. App. Bd.,* 2 Cal.3d 943, 952 [88 Cal.Rptr. 175, 471 P.2d 975].)

■ The significant test of an agency relationship is the principal's right to control the activities of the agent. (*Tieberg* v. *Unemployment Ins. App. Bd., supra,* 2 Cal.3d at p. 950; *Malloy* v. *Fong, supra,* 37 Cal.2d at p. 370.) It is not essential that the right of control be exercised or that there be actual supervision of the work of the agent; the existence of the right establishes the relationship. (*Tieberg, supra,* 2 Cal.3d at p. 949; *Malloy* v. *Fong, supra,* at p. 370.)

Dr. Noonan testified that the Canon Law constitutes a set of rules and regulations or laws which are obligatory upon all members of the Catholic clergy, including missionary priests and bishops. He referred to various provisions of the Canon Law which define the role, functions and duties of a missionary priest and the relationship of the missionary priest to the local bishop.

Fr. Copentipy, as well as those missionary priests who preceded him, came to this country for the purpose of ministering to the needs of Basque Catholics in the Western United States, including those within the Fresno Diocese and to attempt to preserve their longstanding Catholic heritage. Fr. Copentipy and his predecessors involved themselves in all phases of the lives of the Basque Catholics they sought to serve. Dr. Noonan testified that the "spiritual care" which the missionary priest has a duty to provide to the immigrants he serves means more than simply the performance of "religious rights." Under Canon Law the ecclesiastical duties of missionary priests include an involvement in the family life of Catholics and a concern with their social conditions.

Canon Law also imposes a general duty upon a bishop to maintain a concern for the welfare of the faithful in light of the needs in the social

circumstances in which they live. Other provisions of Canon Law impose more specific duties upon a local bishop of special concern for immigrant or migrant persons who, on account of their way of life, cannot sufficiently make use of the common and ordinary pastoral services of parish priests within the diocese. Dr. Noonan states that these provisions charged the Bishop of Fresno with seeing that the spiritual and other needs of immigrants within the diocese were met.

Dr. Noonan read other provisions of the Canon Law which define the role of a missionary priest and his relationship to the bishop of the place where he is working. He concluded that such a priest would be "fully subject to the jurisdiction" of the local bishop "as to the exercise of sacred ministry and as to discipline." Dr. Noonan said that this jurisdiction relates to canonical or ecclesiastical duties; when asked specifically about the canonical duties of a priest, he said, "I think that those are the duties laid down in Canon Law, it[']s like asking me what is a legal duty in American Law System; it[']s the legal duties are those specified by law and the Canonical Duties are those specified by Canon Law."

As further evidence that the Bishop of Fresno had the right to exercise control over Fr. Copentipy's activities, Dr. Noonan testified that the canonical duties of obedience imposed upon Fr. Copentipy as a missionary priest included the obligation to obtain the permission of the bishop before commencing any financial undertaking, and a duty to render a financial accounting to the bishop at the end of each year.

Msgr. Roger Mahoney testified for appellant as an expert on Canon Law and as percipient witness to the relationship between the bishop and Fr. Copentipy. He said that Fr. Copentipy remained "incardinated" to the Bishop of Bayonne and had not been "excardinated" to the Bishop of Fresno. He explained that a priest is incardinated at all times during his life to a bishop of a particular diocese, and, unless he is transferred to another diocese and formally incardinated there, he remains incardinated to his original bishop. A priest can only be incardinated in one diocese at a time. Incardination is a formal state by which a priest is made subject to a bishop. Short of incardination, a priest can become an employee of another bishop if he receives an official, written assignment by that bishop. Because Fr. Copentipy was neither assigned nor incardinated to the Bishop of Fresno, Msgr. Mahoney was of the opinion that the Bishop of Fresno had no authority over him.

However, the testimony of Msgr. Mahoney on cross-examination, lends support to the contention that the Bishop of Fresno had the *power* of control but chose not to exercise it. He agreed that Fr. Copentipy was an immigrant missionary priest and that he was bound to minister to the needs of the immigrants as directed by Canon Law. He agreed that the Bishop of Fresno was charged with the duty to care for Catholics within the diocese, i.e., to see that Mass and Communion are offered to them, religious education provided, marriages performed, and to be solicitous of their general well-being. He said that the Bishop of Fresno, not the Bishop of Bayonne, was responsible for Catholics within the Fresno Diocese. Msgr. Mahoney said that a visiting priest is subject to the jurisdiction and control of the Bishop of Fresno only to the extent that the bishop wishes to accept him. The bishop, however, chose to grant Fr. Copentipy only the "faculties of the diocese" which means that he could hear confessions. Unless a priest gets a full, written assignment from the local bishop, that bishop does not have jurisdiction over the priest.

The jury reasonably could have construed Msgr. Mahoney's testimony on cross-examination to mean that while the bishop was charged with the responsibility for all Catholics within the diocese, Fr. Copentipy, as a migrant priest, also was charged with the responsibility for ministering to the migrant Basque Catholics within the diocese; thus, Fr. Copentipy was performing some of the duties the bishop was responsible for. From this it may be inferred that the bishop, had he so chosen, could have exercised full authority over Fr. Copentipy by extending to him an official, written assignment. Coupled with these inferences from Msgr. Mahoney's testimony is the testimony of Dr. Noonan that the Bishop of Fresno did in fact have ecclesiastical jurisdiction over Fr. Copentipy as to the exercise of his ministry and as to discipline.

There is other evidence to support the finding of agency. Respondents introduced into evidence a letter dated January 27, 1970, written by the bishop to the United States Immigration and Naturalization Service which stated:

"This is to certify that the Reverend Guillaume Copentipy, Catholic priest belonging to the diocese of Bayonne, has been requested to work in the western states of the United States *with headquarters at the diocese of Fresno; Fresno, California, and under the direction of the undersigned Bishop of this diocese.* This is to certify that he will not become in any way a burden to the Federal, State and Local governments of the United States." (Italics added.)

This letter was admitted into evidence as an exception to the hearsay rule. (Evid. Code, § 1220.) It constitutes an admission of the Bishop of Fresno and was properly considered by the jury. An inference of the existence of a right of control by the bishop over Fr. Copentipy arises from this letter.

■ Thus, while the evidence of agency is not strong and another trier of fact well might have reached an opposite conclusion, the evidence is sufficient to sustain the jury's finding that the bishop had the right to control the activities of Fr. Copentipy.

■ There is also sufficient evidence to support the jury's finding that Fr. Copentipy was acting within the scope of his agency at the time of the accident. In *Hinman* v. *Westinghouse Elec. Co.*, 2 Cal.3d 956 [88 Cal.Rptr. 188, 471 P.2d 988], the court addressed the issue of whether the "coming and going" rule insulated an employer from liability pursuant to a *respondeat superior* theory where a negligent employee injured the plaintiff in a car accident that occurred as the employee was returning home from work on company time. The court stated that the modern justification for vicarious liability is a deliberate allocation of the risk: "The losses caused by the torts of employees, which as a practical matter are sure to occur in the conduct of the employer's enterprise, are placed upon that enterprise itself, as a required cost of doing business. [The risk is] placed upon the employer because, having engaged in an enterprise which will, on the basis of past experience, involve harm to others through the torts of employees, and sought to profit by it, it is just that he, rather than the innocent injured plaintiff, should bear them; and because he is better able to absorb them, and to distribute them, through prices, rates or liability insurance, to the public, and so to shift them to society, to the community at large." (2 Cal.3d at pp. 959-960.)

Applying this rationale the court concluded that the "coming and going" rule would not provide an exception to *respondeat superior* where the trip involved an incidental benefit to the employer. The court found such an incidental benefit where a salesman was required to see clients outside the office and to do field work and where an employer paid an employee mileage for traveling to and from work which enabled the employer to reach out beyond the normal labor market. (2 Cal.3d at pp. 961-962.) (See also *Huntsinger* v. *Glass Containers Corp.*, 22 Cal.App. 3d 803 [99 Cal.Rptr. 666] [incidental benefit to an employer where an employee, a "technical service representative," was required to make unplanned and unpredicted field trips to consult with customers; employer liable for accident on way home].)

On the day of the accident, Fr. Copentipy had received a telephone call from a Mr. Sallaberry in Kerman who requested that he stop by to see a visiting relative. Fr. Copentipy went to Kerman and remained there about one and one-half hours. He then went to the home of another Sallaberry family to visit them and to relay information to them of the death of a Basque relative in Wyoming. After dinner, Fr. Copentipy left to return to his room in Fresno, and he gave a ride to a Basque sheepherder who was visiting his sister, Mrs. Sallaberry. It was on the way home from Madera that the accident occurred.

As stated above, the Bishop of Fresno was charged with the duty of caring for all of the Catholics within the diocese. Fr. Copentipy was also bound to minister to the needs of the Catholic Basques within the diocese. When he visited local Basque families, including the Sallaberrys, he did so as a priest as well as a friend. Fr. Copentipy testified that he was a priest seven days a week and that the role of a priest and a friend are indistinguishable. Thus, the work Fr. Copentipy was performing on the day of the accident was of incidental benefit to the Bishop of Fresno because he was carrying out the obligation to members of the diocese that the bishop was charged with; he therefore was acting within the scope of the agency.

Appellant relies on *Malloy* v. *Fong, supra,* 37 Cal.2d 356, where the Supreme Court held as a matter of law that a minister was not liable for the acts of his assistant because they were both subagents of the Presbytery. A crucial fact in the case was that the church to which the minister was assigned was a new, unestablished church over which the Presbytery exercised considerable control. The court also discussed the fact that *respondeat superior* is not applicable to the relationship between a supervisor and his subordinate employees because the supervisor is usually a wage-earner and does not occupy an economic and legal position similar to an employer. Appellant contends that the Bishop of Fresno is comparable to the minister, i.e., he is only a supervisor. However, appellant occupies a far different position; the bishop is the administrative head of the Diocese of Fresno. The diocese includes eight counties within Central California. If an analogy is to be drawn to the *Malloy* case, appellant would be in the position of the Presbytery.

Similarly, appellant relies upon *Roman Catholic Archibishop* v. *Superior Court, supra,* 15 Cal.App.3d 405. In that case, the plaintiff, while in Switzerland, made a down payment on a St. Bernard dog which he proposed to purchase from a Catholic monastery there. The deal fell

through and he filed suit in San Francisco, naming as a defendant the Archbishop of San Francisco. The Court of Appeal issued a writ directing the dismissal of the action. The plaintiff argued that the Swiss monastery, the Catholic Church and the San Francisco Archbishop were all "alter egos" of each other. The court stated that the archbishop and the monastery were, at most, subagents of the Church itself. The crucial fact, however, was that there was no evidence of control, geographical connection or dealings between the archbishop and the monastery. In contrast, the Bishop of Fresno and Fr. Copentipy operated within coextensive geographic areas; the bishop had granted "faculties" to Fr. Copentipy, and there was some evidence of the right of control by the bishop over Fr. Copentipy.

Appellant next asserts that the trial court erred in refusing to grant a new trial.

Code of Civil Procedure section 657 provides that in the trial court, "A new trial shall not be granted upon the ground of insufficiency of the evidence to justify the verdict or other decision . . . unless after weighing the evidence the court is convinced from the entire record, including reasonable inferences therefrom, that the court or jury clearly should have reached a different verdict or decision."

■ On appeal, in the absence of a showing of abuse of discretion, the trial court's ruling on a motion for new trial must be upheld. (*Bardessono* v. *Michels,* 3 Cal.3d 780, 796 [91 Cal.Rptr. 760, 478 P.2d 480, 45 A.L.R.3d 717].) The only way it can be said that there was an abuse of discretion is to say there was no evidence of agency. As this cannot be said, the trial court's denial of a new trial must stand.

■ Similarly, a motion for judgment notwithstanding the verdict may not be granted unless, indulging in every presumption in favor of the opposing party's evidence, there is no evidence of substantial value to support a verdict in favor of the opposing party. (*Estate of Lances,* 216 Cal. 397, 400 [14 P.2d 768]; *Spillman* v. *City etc. of San Francisco,* 252 Cal.App.2d 782, 786 [60 Cal.Rptr. 809]; Code Civ. Proc., § 629.) There was no error in denying this motion.

Appellant asserts several instructional errors. ■ At the request of respondents, the court instructed the jury that: "An employee may be at the same time under a general and a special employer, and neither employer retains sole power over the employee. If the special employer has the right to control the details of the work, he becomes liable for damages proximately resulting from that activity."

The instruction was proper, as there was evidence of dual employment. Fr. Copentipy was sent to the United States by the Bishop of Bayonne, that bishop determined the length of his stay, and he remained incardinated to the Bishop of Bayonne. ■■ A general and special employment relationship may be present if there exists in each some power, not necessarily complete, of direction and control. (*Miller* v. *Long Beach Oil Dev. Co.,* 167 Cal.App.2d 546, 550 [334 P.2d 695].)

The court also instructed the jury that: "The defendant Roman Catholic Bishop of Fresno is a corporation sole, and as such is liable under law for conduct of its agents just as any other person or corporation would be; the law does not distinguish between religious or business enterprises in that respect."

The court refused appellant's instruction that: "A corporation sole is a legal corporation created by the laws of the State of California. The powers of a corporation sole are entirely distinct from the spiritual side of the church, and in order that a religious society be recognized by law it must be shown that it is capable of making contracts, accepting benefits, and of suing and being sued."

■■ Appellant contends that the giving of one and refusing of the other was error because it put undue emphasis on Dr. Noonan's testimony relating to ecclesiastical matters and a distinction was not drawn between the Roman Catholic Church as a legal entity and as a spiritual organization. Appellant contends that the jury could not have known that the Bishop of Fresno is a distinct legal entity from other dioceses and from the Vatican. Appellant states that its refused instruction was drawn from Corporation Code section 10007, *Roman Catholic Archbishop* v. *Superior Court, supra,* 15 Cal.App.3d 405, and *Archbishop* v. *Industrial Acc. Com.,* 194 Cal. 660 [230 P. 1].

Corporation Code section 10007 provides that a corporation sole may sue and be sued, contract, borrow money, deal in real and personal property, etc. Section 10002 provides that a corporation sole may be formed by the bishop of any religious denomination, church or society for the purpose of administering and managing the affairs, property, and temporalities thereof.

In *Archbishop* v. *Industrial Acc. Com., supra,* the court made the statement that the corporate powers to sue, contract, etc., are entirely distinct from the spiritual side of the church, and in order that a religious

society be recognized by law, it must be shown that it has the capability of exercising such powers. (194 Cal. at p. 677.) This statement, however, was made in the course of a discussion as to whether the archbishop was an "employer" and "in business" within the scope of the Workmen's Compensation Act where a worker, injured while working on a parish church, sought benefits. The court affirmed a judgment against the archbishop. The statement was not of particular importance in the case, because, as the court said in its next statement, it was established that the archbishop was a corporation sole.

Likewise, in this case, there was no issue as to whether the Bishop of Fresno was a corporation sole. Other instructions stressed that the issue before the jury was whether Fr. Copentipy was appellant's agent. It does not appear that the instruction given misled the jury. Moreover, we can only assume that appellant's counsel in his closing argument carefully stressed the distinction between the Roman Catholic Church as a legal entity and as a spiritual organization.

Referring to the letter written by the Bishop of Fresno to the Immigration and Naturalization Service, appellant offered an instruction which said that: "A sponsor's letter of support to the Department of the Immigration is merely evidence on the issue of whether the applicant for a visa is likely to become a public charge. It creates no legal obligation, only a moral one."

The requested instruction was based on *County of San Diego* v. *Viloria,* 276 Cal.App.2d 350 [80 Cal.Rptr. 869], wherein the defendant signed a similar affidavit to secure the admission into the country of a Mexican alien. The alien later became ill and the county was obligated to provide him medical services as an indigent. The county sued defendant for reimbursement alleging the affidavit was a contract with the government. The court held there was no contract.

In this case, it was not suggested that the bishop's letter had the binding effect of a contract; it was offered only as evidence tending to show the existence of an agency relationship between Fr. Copentipy and the Bishop of Fresno. The wording of the requested instruction could easily have misled the jury into believing the letter had no evidentiary relevance to the issue of agency. It was properly refused.

Appellant offered an instruction which was refused, in the form of BAJI No. 14.72 as follows: "You have been instructed on the subject of

the measure of damages in this action because it is my duty to instruct you as to all the law that may become pertinent in your deliberations. The fact that you have been instructed on the subject of damages must not be considered as intimating any view of my own on the issue of liability or as to which party is entitled to your verdict."

■ It is not prejudicial error to refuse such an instruction where it is made clear in other damage instructions that they are applicable only if liability is found. (*De Ruiz* v. *Jack Rudy Trucking Co.,* 171 Cal.App.2d 609, 616 [341 P.2d 388]; *Hoagland* v. *Chargin,* 134 Cal.App.2d 466, 477-478 [286 P.2d 931].) In this case, it was made clear to the jury in a number of other instructions that they had to find liability before awarding damages, that they were not to take a cue from the judge, and that all instructions were not necessarily applicable. There was no prejudicial error in refusing BAJI No. 14.72.

We have considered appellant's other contentions and find them to be without merit.

The judgment is affirmed.

Gargano, Acting P. J., and Ginsburg, J.,* concurred.

A petition for a rehearing was denied August 13, 1975, and appellant's petition for a hearing by the Supreme Court was denied September 10, 1975.

---

*Assigned by the Chairman of the Judicial Council.