No. 61,430

JOHN H. BRILLHART, GARY BRILLHART, JUDY BRILLHART, and JOHN SILVA PERRY, *Appellants*, v. STEVEN SCHEIER and THE CATHOLIC DIOCESE OF WICHITA, *Appellees*.

(758 P.2d 219)

Opinion filed July 11, 1988.

*Stanley R. Juhnke* and *Herbert R. Hess, Jr.*, of Hutchinson, argued the cause, and *Scott Mann*, of Hutchinson, was with them on the brief for appellants.

*Arthur S. Chalmers*, of Kahrs, Nelson, Fanning, Hite & Kellogg, of Wichita, argued the cause and was on the brief for appellee The Catholic Diocese of Wichita.

The opinion of the court was delivered by

HERD, J.: This is an appeal of a personal injury action wherein a summary judgment was entered in favor of the Catholic Diocese of Wichita. The district court ruled the negligence of Father Steven Scheier, pastor of a Catholic parish, could not be imputed to the diocese.

Appellants were injured when their pickup was struck by a car driven by Father Scheier, pastor of Sacred Heart Parish in Fredonia. The parish is now part of the Catholic Diocese of Wichita, a not-for-profit organization incorporated in the State of Kansas, although it existed well before the corporation's formation. Father Scheier owned and insured the car. He had no subsequent recollection of the accident, or the events preceding it. He did recall going to Wichita to visit a friend, Father Ken Melaragno, to discuss problems he was having with his parish's Altar Society. He had no subsequent recollection of the visit.

Appellants filed suit against Father Scheier and against the diocese under the doctrine of respondeat superior. They claimed Scheier was an employee of the diocese who was acting within the scope of his employment at the time of the accident. On June 12, 1987, the district court heard arguments on motions by both the diocese and appellants for summary judgment and granted

summary judgment in favor of the diocese. The court found there was not an employee/employer relationship between the parish priest and his diocese for the purpose of imputing negligence under civil law. It found the diocese's right to control over Father Scheier was based on ecclesiastical rather than civil law.

The Roman Catholic Church is hierarchical in nature, extending from the parish to the diocese and ultimately to the Pope. Each diocese is headed by a bishop and contains a number of parishes, each headed by a pastor. The pastor is required to conduct his parish according to church canons and diocesan statutes. A pastor may be removed from office, but only for serious cause and then under specific procedures requiring the bishop to confer with others and allowing the pastor to appeal the decision. Diocesan law sets the amount of each pastor's salary. Under Canon Law, if a pastor's compensation exceeds his needs, he is obligated to return the excess to the diocese. Wichita Diocesan statutes prescribe a salary of $400 a month and a car allowance of $300 a month. The Wichita Diocese now follows the majority of diocese in issuing a W-2 form to each priest. This policy was instituted after a tax dispute over whether priests were considered to be self-employed. The pastor is required by diocesan statute to report to the bishop annually on the financial and spiritual status of the parish.

The bishop is clearly the pastor's superior under ecclesiastical law. The evidence shows, however, that a pastor's day-to-day activities are within his own discretion and control. He is authorized under Canon Law to do whatever he feels is necessary to carry out his duties. He sets his own hours and vacation. He makes out his own paycheck, and hires or fires any non-priest/non-deacon employee, such as secretaries and janitors. Such salaries, including his own, come from parish receipts. The pastor has complete discretion in purchasing church supplies and paying the bills from parish funds. The details of daily bookkeeping and accounting of sums received and spent by the parish are not reviewed by the diocese.

Appellants do not dispute the facts in the case. They argue only that the facts create a question for the jury whether an employer-employee relationship existed between the diocese and Father Scheier. The diocese asserts Father Scheier's legal

relationship to it in an imputed negligence analysis is that of an independent contractor rather than an employee.

Resolution of conflicting evidence which might establish the existence of an agency is for the finder of fact. *Aetna Casualty and Surety Co. v. Hepler State Bank,* 6 Kan. App. 2d 543, 548, 630 P.2d 721 (1981). What constitutes an agency, however, is a question of law. *Fredricks v. Foltz,* 225 Kan. 663, 670, 594 P.2d 665 (1979).

Thus, the sole issue before this court is whether it may be found, as a matter of law from the uncontroverted facts, that the diocese may not be held liable under the doctrine of respondeat superior, or whether it is for the jury to weigh the facts and decide whether Father Scheier was an employee under established agency law. The specific question to be answered is whether a pastor's negligence while engaged in activity beneficial to his diocese (viewing the evidence most favorably to the appellant), but within his own discretion and control, may be imputed to his diocese.

The phrase "imputed negligence" refers to the doctrine which places upon one individual responsibility for the negligence of another. *Schmidt v. Martin,* 212 Kan. 373, 375, 510 P.2d 1244 (1973). The doctrine of imputed negligence, or respondeat superior, has its origin in public policy. It is elemental that every person conduct his business so as not to cause injury to others, and if he conducts business through others, he is bound to manage them so third persons are not injured by the others while they are doing the principal's business within the scope of their authority. The doctrine is a "fiction of the law," not favored in this state, which is limited to master/servant (employer/employee) and joint enterprise relationships. *Schmidt,* 212 Kan. at 376. See *Lightner v. Frank,* 240 Kan. 21, 26, 727 P.2d 430 (1986). These are relationships in which the potential respondents have sufficient control and responsibility for the actions of others to justify holding them liable for their actions.

Professors Prosser and Keeton explain the "multitude of very ingenious reasons" offered to justify the doctrine in the master/servant relationship:

"[The employer] has a more or less fictitious 'control' over the behavior of the servant; he has 'set the whole thing in motion,' and is therefore responsible for what has happened; he has selected the servant and trusted him, and so should suffer for his wrongs, rather than an innocent stranger who has had no opportu-

nity to protect himself; it is a great concession that any man should be permitted to employ another at all, and there should be a corresponding responsibility as the price to be paid for it—or, more frankly and cynically, 'In hard fact, the reason for the employers' liability is the damages are taken from a deep pocket.' None of these reasons is so self-sufficient as to carry conviction, although they are all in accord with the general common law notion that one who is in a position to exercise some general control over the situation must exercise it or bear the loss. . . .

"What has emerged as the modern justification for vicarious liability is a rule of policy, a deliberate allocation of a risk. The losses caused by the torts of employees, which as a practical matter are sure to occur in the conduct of the employer's enterprise, are placed upon that enterprise itself, as a required cost of doing business. They are placed upon the employer because, having engaged in an enterprise, which will on the basis of all past experience involve harm to others through the torts of employees, and sought to profit by it, it is just that he, rather than the innocent injured plaintiff, should bear them; and because he is better able to absorb them, and to distribute them, through prices, rates or liability insurance, to the public, and so to shift them to society, to the community at large. Added to this is the makeweight argument that an employer who is held strictly liable is under the greatest incentive to be careful in selection, instruction and supervision of his servants, and to take every precaution to see that the enterprise is conducted safely." Prosser and Keeton on Torts § 69 (5th ed. 1984).

In contrast to an "employee" under the respondeat superior doctrine, an "independent contractor" is one who contracts to do certain work according to his own methods, without being subject to the control of his employer, except as to the result of his work. An independent contractor therefore represents the will of his employer only in the result, and not as to the means in which it is accomplished. *Snedden v. Nichols,* 181 Kan. 1052, 1055, 317 P.2d 448 (1957). Thus, one who hires such an individual is not liable for that party's negligence. See *Wallis v. Secretary of Kans. Dept. of Human Resources,* 236 Kan. 97, 689 P.2d 787 (1984).

The primary test to determine whether one is an employee or an independent contractor is the "right to control" test. The employer need not actually control the work of the employee; he need only have the *right* to control the work. *Danes v. St. David's Episcopal Church,* 242 Kan. 822, Syl. ¶ 3, 752 P.2d 653 (1988). Other tests include the authority to discharge the employee before work is completed, *Schroeder v. American Nat'l Bank,* 154 Kan. 721, 724, 121 P.2d 186 (1942), and control over payment of wages and the amount paid, *Davis v. Julian,* 152 Kan. 749, 756, 107 P.2d 745 (1940).

Whether ecclesiastical superiority, which clearly exists herein

in the bishop/pastor relationship, constitutes a legal master/servant relationship in civil law has not previously been before this court. Other jurisdictions have reached varying results, although all focus on the issue of control. In *Leahey v. Williams,* 141 Mass. 345, 6 N.E. 78 (1886), the Massachusetts Supreme Court ruled in favor of the bishop in an action for the recovery of money borrowed by pastors for the purchase of real estate held in the name of the bishop, because the evidence indicated parish pastors were autonomous in the secular affairs of their parishes.

An opposite result was reached in *Roman Catholic Archbishop v. Industrial Acc. Com.,* 194 Cal. 660, 230 Pac. 1 (1924), a workers' compensation case in which a carpenter was injured while reshingling a roof of a Roman Catholic Church. The court noted, however, that had it been alleged and proved that it was not a part of the bishop's duties to have the roof repaired, but rather the duty of the parish pastor, the result might have been different.

Facts similar to the instant case are found in *Ambrosio v. Price,* 495 F. Supp. 381 (D. Neb. 1979), in which a parish priest was involved in a car accident on his way to visit friends. Suit was brought against the parish as well as the priest and the Archbishop. All parties moved for summary judgment. The court granted summary judgment in favor of the parish and the Archbishop on the basis of scope of employment, but implied in dicta that imputed negligence could have been found had the priest acted upon the orders of the church for its benefit. 495 F. Supp. at 385.

A final case relied upon by appellants, *Stevens v. Roman Catholic Bishop of Fresno,* 49 Cal. App. 3d 877, 123 Cal. Rptr. 171 (1975), is inapplicable because the alleged negligence was that of a missionary priest who did not hold the office of pastor and the appellate court based its decision on Canon Law, a position contrary to Kansas case law. See generally *Gospel Tabernacle Body of Christ Church v. Peace Publishers & Co.,* 211 Kan. 420, 506 P.2d 1135, *reh. denied* 211 Kan. 927, 508 P.2d 842 (1973).

Two Kansas automobile cases are pertinent on the doctrine of respondeat superior in this state. In *Houdek v. Gloyd,* 152 Kan. 789, 107 P.2d 751 (1940), defendant Gloyd, acting as a salesman for Oehlert Tractor & Equipment Company, was alleged to have

negligently caused an automobile accident. Gloyd was traveling in his own car for the purpose of selling equipment for Oehlert when the accident took place. Gloyd made his living by purchasing equipment at 85% of the list price from Oehlert and then selling the equipment for whatever profit he could make. If the customer was going to defer payment on the equipment, Oehlert had to approve the terms of the sale. If a trade-in was being arranged, Oehlert had to fix the price on the trade-in. Gloyd did not receive a salary and expenses were not paid by Oehlert. He was not directed where to make sales, but was told not to interfere with Oehlert's regular salesmen. Sales were reported to the company. Oehlert withheld social security taxes and had the right to terminate its arrangement with Gloyd. On the basis of these facts and circumstances, the court held an independent contractor relationship existed. While Oehlert had the right to terminate the relationship and had some general supervisory control over Gloyd, it did not control the details and physical services supplied by Gloyd. The court held Oehlert's payment of social security taxes was not relevant to the issue of whether Gloyd was an employee for purposes of imputing negligence.

Similarly, in *Hurla v. Capper Publications, Inc.*, 149 Kan. 369, 87 P.2d 552 (1939), the court held as a matter of law that a newspaper deliveryman who used his own car was not an employee for purposes of imputing negligence because the evidence demonstrated the employer did not have the right to control the physical conduct of the carrier in the performance of his duties.

Applying the "right to control" test to the case herein, we see the diocese has no control over the day-to-day activities of a parish pastor. Although a diocese sets a pastor's salary and has the power to eventually remove him from office, the pastor retains significant control even in these areas. Moreover, the pastor is clearly in control of his parish. He performs his duties as he sees fit, and is required only to make annual reports of status and planning to the diocese.

In the present case, if the negligence of the pastor may be imputed to the diocese, it logically may be extended to the Pope, as all control over the pastor's employment ultimately stems from Roman Catholic ecclesiastical law, in which the Pope is the highest authority.

Restatement (Second) of Agency § 220 (1957) lists several factors which are helpful in determining whether an individual is to be held an employee for purposes of imputing fault. Some of the factors (such as long-term employment, by one employer, in one area) support appellants' position (§ 220 Comment h). Other factors support the position of the diocese. The diocese does not control the details of the pastor's work, much of which may be delegated by the pastor as he sees fit. The work is of a type which requires a high level of skill and experience and is generally done without supervision. The pastor is in control of his workplace and provides his own supplies and even his salary from parish proceeds.

Father Scheier was driving his own self-insured automobile on the day of the accident, a factor which has repeatedly been held significant in determining agency. He had purchased personal insurance to cover liability arising out of his use of the automobile. The diocese did not request Father Scheier to visit his friend; he chose to go on his own accord. He neither advised nor sought permission of the diocese, as was in keeping with his autonomous position as pastor.

In a typical respondeat superior situation, the employee would not be expected to procure insurance to protect against liability for his actions at work. His potential negligence is viewed by his employer as "a required cost of doing business" which may be shifted to society at large. See Prosser and Keeton on Torts § 69. In such a situation, an innocent victim would often not be able to recover damages for negligence unless the employee's negligence was imputed to the employer. The doctrine of respondeat superior allows the victim to reach the "deep pocket" which benefits from the risk undertaken, and thus encourages an employer to supervise his employees to prevent injuries to others caused by the employees' negligence. The case at bar is not a typical respondeat superior situation where public policy dictates imputed liability.

We have carefully examined the record before us and conclude that under these facts and circumstances the legal relationship of Father Scheier to his diocese was that of an independent contractor, as the district court correctly determined. There are no genuine issues of material fact and the diocese is entitled to judgment as a matter of law. See K.S.A. 1987 Supp. 60-256(c).

The decision of the district court is affirmed.

LOCKETT, J., dissenting: I disagree with the majority's holding as a matter of law that the relationship of Father Scheier, pastor of a Catholic parish, to his diocese is that of an independent contractor. I believe the motion for summary judgment and the supporting affidavits raised a genuine issue of material fact regarding the status of the pastor as an employee and whether he was acting within the scope of his employment at the time of the accident. Therefore, I must dissent.

I agree with the majority's recitation of the general rule that an independent contractor is one who contracts to do a piece of work according to his own methods without being subject to the control of his employer, except as to the result of his work, and one who represents the will of his employer only in the result of his work and not as to the means by which it is accomplished. *Snedden v. Nichols*, 181 Kan. 1052, 1055, 317 P.2d 448 (1957). As the majority opinion states, the primary test to determine whether one is an employee or an independent contractor is the so-called "right to control" test. Under this test, if the alleged employer has the right of control and supervision over the work of the alleged employee and the right to direct the manner in which the work is to be performed as well as the result which is to be accomplished, an employer/employee relationship exists. See *Wallis v. Secretary of Kans. Dept. of Human Resources*, 236 Kan. 97, Syl. ¶ 5, 689 P.2d 787 (1984).

Applying the "right to control" test to the facts of this case, it is clear that the Catholic Diocese of Wichita retains a significant right of control over its pastors. Although this court has recognized a distinction between civil and ecclesiastical law, internal regulations of religious organizations have been determined to be relevant to the existence of agency relationships between church bodies and religious workers. See *Stevens v. Roman Catholic Bishop of Fresno*, 49 Cal. App. 3d 877, 123 Cal. Rptr. 171 (1975).

In his deposition, Father Ronald Gilmore, Chancellor of the Diocese of Wichita, stated that in the Roman Catholic Church, the bishop is the priest of the diocese and all other priests are his assistants. The bishop selects his priests after a training process, ordains them, and gives them jurisdiction to function within a given parish. A priest is not free to go from diocese to diocese.

Before a priest is ordained, he promises obedience to the bishop of the diocese and signs a document to that effect. The bishop sets an agenda or master plan for all the various parishes within his diocese. The parish then formulates short-range plans and submits them to the bishop for his approval. Church canons and diocesan statutes prescribe the duties that are to be performed by a priest. If a parish priest desires to operate outside these guidelines, the bishop's permission must be obtained. The bishop has the right to remove a parish priest from his post. It is particularly the right of the diocese to ordain and remove priests, to approve and disapprove their transfer to other parishes, and to supervise and control the overall activity of the parishes; all of these rights support the existence of an employer/employee relationship between the diocese and the priest in this case.

The "right to control" test, however, is not an exclusive one. Other commonly recognized indicia of the status of an independent contractor include the existence of a contract for the performance of work at a fixed price, the independent nature of the business, the right to employ assistants with the right to supervise their activities, the right to control the progress of the work except as to final results, the time for which the worker is employed, the method of payment, and whether the work is part of the regular business of the employer. See 41 Am. Jur. 2d, Independent Contractors § 5, pp. 744-45.

Additional factors which should be considered include whether the one employed is engaged in a distinct occupation or business; the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision; the skill required in a particular occupation; whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work; the length of time for which the person is employed; and whether the parties believe they are creating the relationship of master and servant. Restatement (Second) of Agency § 220 (1957). No one particular factor is controlling, but each case must be judged on its particular facts.

The majority states that the priest should be classified as an independent contractor due to the "enormous discretion" which the priest exercises in the daily operation of the parish, citing, as examples of this discretion, that the priest makes out his own

paychecks and is responsible for the daily accounting and book-keeping. In actuality, however, the priest's role in the finances of the parish is clearly circumscribed by the diocese. The pastor receives a monthly salary funded by parish receipts; however, the amount of his compensation is fixed by the diocese at $700 per month, and allocated by the diocese at $400 for living expenses and $300 for automobile expenses. All priests take a vow of poverty and must remit to the diocese any amount of their monthly allowance which they do not spend and submit annual reports to the diocese.

There are also other factors which weigh against the classification of the priest as an independent contractor: (1) At the end of the tax year, the diocese issues a W-2 or W-4 form to each individual priest. (2) A priest is considered to be on call 24 hours a day; vacation policy is set by the diocese. (3) The priest's term of employment is indefinite. (4) The priest's work clearly furthers the regular business of the diocese. (5) The priest is not engaged in an independent occupation in the sense that he contracts with different churches to perform pastoral services on a job-by-job basis: rather, he is engaged solely in his parish and can accept no other assignments without the consent of the bishop.

Finally, it is important to consider that the doctrine of respondeat superior has its origin in public policy. The maxim of respondeat superior is grounded on the principle that he who expects to derive advantage from an act which is done by another for him must answer for any injury which a third person may sustain from it. 53 Am. Jur. 2d, Master and Servant § 417. As the majority states, the employer/employee relationship is one in which the potential respondents "have sufficient control and responsibility for the actions of others to justify holding them liable for their actions." It is those parties who control the enterprise who are the proper parties to be charged with the responsibility for preventing, administering, and distributing the risk of loss. Prosser and Keeton on Torts § 71, p. 509 (5th ed. 1984).

Public policy was a significant consideration in *Malloy v. Fong*, 37 Cal. 2d 356, 232 P.2d 241 (1951), where plaintiff brought suit against, among others, a Presbyterian pastor and the Presbytery of San Francisco, to recover for injuries sustained in

an automobile accident allegedly caused in part by the pastor's negligence. After a jury returned a verdict in favor of the plaintiff, the trial court granted the Presbytery's motion for judgment notwithstanding the verdict. The California Supreme Court reversed. Justice Traynor, writing for the majority, emphasized that the element of skill required in a particular occupation is closely linked to public policy considerations behind the reluctance to impose vicarious liability upon employers for torts of an independent contractor:

"A property owner, for example, may be unable to understand the intricacies of erecting a building upon his land—the most that he can ordinarily be expected to do is to use care in the selection of a construction contractor. The Presbytery contends that the services here involved were 'professional,' like those rendered by a physician or attorney, and that as a matter of law a minister should be regarded as an independent contractor. [However], the skills possessed by [the pastor] were also possessed by the Presbytery; it was the Presbytery in fact that determined that he was qualified for this position, whereas medical, legal, or construction experts are examined and licensed by state authority. None of the duties performed by [the pastor] were too complicated for efficient supervision by the Presbytery." 37 Cal. 2d at 371.

For the *Malloy* court, the fact that the Presbytery possessed the requisite skill to ordain and supervise the pastor was an important factor in allocating the risk of the pastor's negligence to the Presbytery, as long as the negligent acts occurred within the scope of the pastor's employment. Similarly, the priest's vow of obedience and poverty, and the conduct of his parish according to church canons and statutes, should also be considered in an allocation of risk analysis. Generally, a person may be said to be an employee rather than an independent contractor when, in the eyes of the community, he would be regarded as a part of the employer's own working staff and not otherwise. Prosser and Keeton on Torts § 70, p. 501. Here, the pleadings and affidavits raised a genuine issue of material fact as to whether the priest was a part of the working staff of the diocese for the purposes of imputing negligence. I would reverse the grant of summary judgment and remand the matter to the district court for further proceedings.

PRAGER, C.J., joins the foregoing dissent.