NOT DESIGNATED FOR PUBLICATION

No. 124,107

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

SUSAN TAYLOR,
*Appellant*,

v.

WILLIAM WACHTER,
as Special Administrator for the
ESTATE OF JOAN EILEEN WARNER
HOUGH,
*Appellee*.

MEMORANDUM OPINION

Appeal from Montgomery District Court; JEFFREY GETTLER, judge. Opinion filed May 20, 2022.
Affirmed.

*Angela Spigarelli* and *Fred Spigarelli*, of The Spigarelli Law Firm, of Pittsburg, for appellant.

*Richard P. Billings* and *Craig C. Blumreich*, of Larson & Blumreich, Chartered, of Topeka, for
appellee.

Before POWELL, P.J., GREEN, J., and RICHARD B. WALKER, S.J.

PER CURIAM: In 2010, Susan Taylor fell from a trailer while vaccinating and
deworming Joan Eileen Warner Hough's horses. The fall resulted in a severe right leg
injury, and Taylor sued Hough, alleging negligence. Eventually, the district court granted
Hough's motion for summary judgment, finding that no genuine issues of material fact
existed. The district court rejected Taylor's claim that Hough failed to exercise reasonable
care under all the circumstances by failing to maintain a safe and secure facility or

method used to vaccinate and deworm the horses because Taylor engaged in an activity with obvious dangers, and the alleged defects on Hough's property did not contribute to her fall from the trailer. The district court also deemed Taylor an independent contractor under the circumstances and concluded Hough had no duty to provide a safe working environment. The district court also rejected Taylor's second negligence claim regarding Hough's alleged failure to warn her about the wild nature of the horses, finding that Taylor had previous experience dealing with wild horses and observed the apparent wild nature of the horses before voluntarily engaging in the activity that led to her injury. Finally, the district court found that Taylor's claims were barred by the Domestic Animal Activity Doctrine. See K.S.A. 60-4001 et seq.

Taylor appeals, arguing the district court erred by granting summary judgment. We affirm the district court's grant of Hough's motion for summary judgment because there are no material factual disputes, and the district court correctly determined Taylor could not recover under her alleged theories of negligence.

FACTS

In 2010, Joan Eileen Warner Hough owned two farms and a veterinary clinic. She lived on one of her farms located outside the city limits of Coffeyville, approximately 12 miles away from her veterinary clinic. At the veterinary clinic, Hough served as the only veterinarian but hired one or two other employees to assist her around the office. As a veterinarian, she dealt almost exclusively with smaller animals, such as dogs, cats, and a few exotic animals. But on her personal farm, she raised horses as a personal hobby and had done so for many decades. Hough believed she had approximately 29 horses in 2010. Those horses were not part of her veterinary practice.

By May 2010, Susan Taylor had worked as a part-time veterinary assistant in Hough's veterinary clinic for approximately three months. While employed there, she

2

answered the telephone, received patients, checked patients out, and generally assisted Hough around the clinic. Her job duties never required her to leave the veterinary clinic. As such, she had never been to Hough's residence, though her husband had been there a few times to assist Hough in taking care of Hough's horses.

Hough said she asked Taylor and her husband to come to her house because she learned through conversations at the clinic that Taylor and her husband had their own horses and had a lot of experience dealing with horses. Like Taylor, Hough said only Taylor's husband went to her house the first few times to assist with the horses. But on May 2, 2010, both Taylor and her husband went to Hough's residence to assist with vaccinating and deworming Hough's horses. Though she did not want to go, Taylor said Hough repeatedly asked her to do so, and Taylor felt she would lose her job if she did not go. Taylor's husband never mentioned anything about Taylor getting fired, but he said he could tell Taylor did not want to go to Hough's residence on May 2, 2010. However, Taylor acknowledged that Hough never threatened to fire her if she did not go. Taylor also acknowledged that she did not go to Hough's residence in her capacity as Hough's veterinary assistant.

Before going to Hough's residence, Taylor never asked Hough anything about the horses they would be interacting with. Taylor did not know how many horses needed vaccinating or the demeanor of the horses. Even so, Taylor did not have any concerns about her physical ability to perform the work because she had worked with horses— including vaccinating and deworming them—for over 30 years. During that span of time, Taylor at all times owned between one and five horses. Similarly, her husband had extensive experience with horses, including vaccinating and deworming them.

When Taylor and her husband arrived at Hough's residence on May 2, 2010, the first thing they did was go behind Hough's house and inspect the area where they would be working. Taylor said her husband had concerns about the condition of the fences in the

3

pen where the horses were being contained. He also had concerns about the lack of a squeeze chute on that portion of the property, but he knew Hough had a squeeze chute on a different portion of the property. A squeeze chute is a device used to control an animal's head and sides to ensure the horse will not strike with its feet or kick someone while the person is performing the vaccination and deworming procedure. Initially, there were 10 to 20 horses in the pen.

Hough would prepare the shots and hand them to Taylor, who would then give them to her husband so he could vaccinate and deworm the horses. When vaccinating the horses, Taylor or her husband would put a syringe in the horses' necks and inject the medicine. Similarly, to deworm the horses, they placed a paste wormer, which looked like a syringe, inside the horses' mouths and shot the medicine inside so the horses would swallow it. The vaccines were administered before the deworming medicine.

For the first batch of horses, Taylor's husband went inside the pen and placed halters on the horses' heads to be able to control their head movements. The halter had a lead rope attached, which was analogous to a dog leash and allowed Taylor's husband to lead the horses to a horse trailer attached to Hough's pickup truck after administering the medicine. All the horses did not fit inside the trailer, so Taylor and her husband took four horses at a time. They then drove the trailer to a different portion of the property where they turned the horses loose in the pasture. In total, Taylor estimated this process took about four hours. They had no problems with the first batch of horses.

After unloading the last trailer of the first batch of horses, Taylor and her husband returned to the pen, and Taylor thought they were done for the day. However, Hough then called between 10 to 20 more horses into the pen. Taylor could immediately tell that this batch of horses was much more nervous and wilder than the first batch. She knew the second batch had not had much human contact, which concerned her. Similarly, her husband also noticed the second batch of horses seemed rowdier than the first and did not

4

appear to have had much human contact. According to Taylor, her husband then told Hough they needed to take a break, finish the process on a different day, or move to the area of the property with the squeeze chute. But Hough told them she wanted them to finish all the horses that day and did not want to move to a different area of the property.

Hough could not recall this conversation, but she said she would never have put any of the horses inside the squeeze chute because the one she had was made for cattle. She said the cattle squeeze chute was too small, too short, and not wide enough to fit the horses, and she did not want to risk getting the horses injured by putting them in that type of chute. She said she had never put any of her horses inside the squeeze cute when they got vaccinated and dewormed.

At that point Taylor's husband devised an alternative plan to vaccinate and deworm the second batch of horses. His plan involved loading the horses into the trailer. The trailer measured approximately 16 feet long and could fit 4 horses inside at a time. The trailer also had a divider on the inside, and two horses stood on each side of the divider. After loading the first four horses, they closed the trailer's back door. In theory, this placement of the horses inside the trailer allowed their movements to be restricted, which would make them easier to handle. Taylor's husband then used rope to secure the horses' heads against the side of the trailer. After he secured the rope, Taylor would stand on the trailer's running boards/fenders and vaccinate and deworm the horses. Once again, Hough prepared the shots and handed them to Taylor. The trailer had fenders on both sides. The width of the fenders on which Taylor stood measured a little less than a foot. Taylor, who wore size five or six shoes, said her feet fit comfortably on the fenders. The fenders were approximately 3 feet off the ground.

Taylor's husband said he had used this method to vaccinate and deworm horses "100,000 times" and found it to be a normal and safe way to do it. When he previously used this method, he said someone always stood on the fenders to administer the

5

vaccinations and deworming medicine. Taylor also said she had used this process once or twice before. But when she had previously used this process, the horses were not as wild as this second batch of Hough's horses.

On this occasion, Taylor started with the two horses facing the driver's side of the trailer and did not have any problems with those horses. She then moved to the passenger's side to vaccinate and deworm the horses near the back of the trailer. Again, she waited for her husband to secure the rope around the horses' necks before she climbed on the fender. She had no problem with the horse closest to the back of the trailer. When her husband secured the rope on the only remaining horse, Taylor did not notice any problems. But when she got back on the fender, the horse started breathing heavily through its nose and shuffling its feet but did not exhibit other signs of distress. Taylor then administered the vaccine and tried to calm the horse. But when she got ready to administer the deworming medicine, the horse started rearing, backing its head away from her, and slamming the side of the trailer. Taylor's husband tried to retain control of the horse with the rope, but he could not completely restrict its movements. Taylor, who was holding onto the roof of the trailer, started working her way down from the fender but lost her grip and fell to the ground.

Taylor landed on her right leg and immediately noticed that it had been broken. Taylor's husband then told Hough to call 911, which she did. A short while later, an ambulance arrived. The emergency responders then transported Taylor to the hospital, where doctors diagnosed her with an "impacted right knee lateral tibia plateau fracture and right tibia shaft commuted fracture." Simply put, Taylor had a serious leg injury and later underwent an "open reduction and internal fixation surgery on her right leg."

Taylor indicated that the trailer did not have any defects and was in good working condition. She said she did not slip. Instead, the horse caused her to lose her balance. She agreed there was nothing dangerous about the trailer itself. Taylor's husband echoed these

statements. He described the trailer as fairly new and said the fender on which Taylor stood was not slippery.

Taylor later acknowledged the inherent risks involved in dealing with horses. She said she knew they were unpredictable animals, and how they act can depend largely on how much time they spend around people. Hough said a horse's demeanor is apparent to people who have spent time around horses. She said it would only take a few minutes to know if a horse had been halter broken by the way the horse acted around people. Hough said that on the date of Taylor's injury, everyone knew of the wilder nature of the second batch of horses.

Despite this, Taylor she said she would not have gone to Hough's residence to assist with vaccinating and deworming the horses had she known how wild the second batch of horses was. Taylor said that she and her husband stayed because they worried Hough would try to perform the work herself and end up getting hurt. But Taylor acknowledged that nothing prevented her and her husband from leaving the property after observing the wilder nature of the second batch of horses. Hough also confirmed that Taylor and her husband were free to leave the property at any time.

In April 2012, Taylor filed suit against Hough, alleging negligence. The following June, Hough filed her answer and denied Taylor's allegations. From September 2012 through January 2017, the district court entered numerous case management orders as the case failed to progress.

In May 2017, Taylor testified in a deposition about what occurred on the day of her injury. In September 2017, both Taylor's husband and Hough testified in their own depositions. Those depositions formed the basis for the facts recounted above.

In October 2017, Hough filed a motion for summary judgment. Taylor filed her response to the motion in December 2017. Later the same month, Hough filed her reply. In July 2018, the district court held a hearing on Hough's motion for summary judgment and ultimately took the matter under advisement. In July 2020, the district court granted Taylor's motion for leave to amend her petition and substitute William Wachter as Special Administrator to Hough's estate because Hough had passed away.

In May 2021, the district court announced its ruling from the bench. The district court began by reciting the legal standard for regarding motions for summary judgment before finding that no genuine issues of material fact existed. The district court then summarized the uncontroverted facts of the case. The district court found that Taylor had more than 30 years of experience working with horses prior to her injury, including vaccinating and deworming them. Based on that experience, Taylor knew horses could be unpredictable, and she had experience dealing with horses that had gotten scared or otherwise acted abnormally when they were being vaccinated.

The district court also found that Taylor and her husband agreed to go to Hough's residence to vaccinate and deworm the horses. The court concluded that Taylor did not go to Hough's residence in her capacity as Hough's veterinary assistant and deemed Taylor's subjective belief she would be fired if she did not go to Hough's residence to be immaterial.

Taylor also noticed the second group of horses were wilder than the first after observing them. After recognizing this, nothing prevented Taylor from refusing to do the work or leaving Hough's property. Instead, Taylor chose to stay and follow the method her husband formulated for vaccinating and deworming the horses, and he had used this method previously on multiple occasions. Hough never exercised control over the method by which Taylor and her husband administered the medicines; Hough only prepared the medication and handed it to Taylor or her husband.

8

The district court concluded the injury occurred after Taylor stuck a needle in one of the horse's necks and lost her footing after the horse hit the side of the trailer. The trailer did not cause the injury because it was in good condition and the fenders were not slippery. Taylor also understood the inherent risk in working with horses, especially ones that had not been handled much. Similarly, Taylor understood the risk of working on the trailer's fenders but made the choice to do so.

The district court then summarized some of the disputed facts it found to be immaterial. These facts include Taylor having no advance knowledge about the horses' demeanors, and Taylor not knowing how many horses needed to be vaccinated and dewormed. The district court also found Taylor's allegations concerning the used pipes, bent wires, gates dragging on the ground, and things not being sufficiently welded on Hough's property to be immaterial because Taylor did not allege any of those conditions caused her injury. Finally, the district court found Taylor's statement that she would not have gone to Hough's property if she had known the horses were wild to be immaterial because Taylor observed the wild nature of the horses prior to working with them.

Next, the district court moved to Taylor's two claims of negligence against Hough. The district court rejected Taylor's claim that Hough failed to exercise reasonable care under all the circumstances by failing to maintain a safe and secure facility or method used to vaccinate and deworm the horses because Taylor engaged in an activity with obvious dangers, and the alleged defects on Hough's property did not contribute to her fall from the trailer. The district court also deemed Taylor an independent contractor under the circumstances and concluded Hough had no duty to provide a safe working environment.

The district court also rejected Taylor's second negligence claim regarding Hough's alleged failure to warn her about the wild nature of the second batch of horses. The district court found that Taylor had previous experience dealing with wild horses and

9

observed the apparent wild nature of the second batch of horses. As such, she knew of the wild nature of those horses before voluntarily engaging in the activity that led to her injury. The district court also found that the trailer had no defects, and Taylor knew of the dangers of climbing on the trailer. Additionally, the district court found that nothing prevented Taylor from leaving Hough's property. Based on these findings, the district court concluded that Hough had no duty to warn Taylor of a known and obvious danger.

Separately, the district court also concluded that Taylor's claims against Hough were barred by the Domestic Animal Activity Doctrine because she assumed the risks associated with vaccinating and deworming the horses and none of the exceptions to the doctrine applied to her case. For these reasons, the district court granted Hough's motion for summary judgment.

Taylor has timely appealed from the district court's decision.

ANALYSIS

On appeal, Taylor contends the district court erred by granting Hough's motion for summary judgment. The standards for deciding summary judgment motions are well known:

> "Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, admissions on file, and supporting affidavits show that no genuine issue exists as to any material fact and the moving party is entitled to judgment as a matter of law. The district court must resolve all facts and reasonable inferences drawn from the evidence in favor of the party against whom the ruling is sought. When opposing summary judgment, a party must produce evidence to establish a dispute as to a material fact. In order to preclude summary judgment, the facts subject to the dispute must be material to the conclusive issue in the case. Appellate courts apply the same rules and, where they find reasonable minds could differ as to the conclusions drawn from the

10

evidence, summary judgment is inappropriate. Appellate review of the legal effect of undisputed facts is de novo. [Citation omitted.]" *GFTLenexa, LLC v. City of Lenexa*, 310 Kan. 976, 981-82, 453 P.3d 304 (2019).

In the negligence context, our Supreme Court has also stated:

"It is also important to remember that '"summary judgment should not be used to prevent the necessary examination of conflicting testimony and credibility in the crucible of a trial.'" In a negligence action, '"summary judgment is proper if the only questions presented are questions of law. To recover for negligence, the plaintiff must prove the existence of a duty, breach of that duty, injury, and a causal connection between the duty breached and the injury suffered. Whether a duty exists is a question of law. Whether the duty has been breached is a question of fact.'" Although summary judgment is rarely appropriate in negligence cases, 'it is proper if the plaintiff fails to provide evidence of an element essential to his case.' [Citations omitted.]" *Thomas v. Board of Shawnee County Comm'rs*, 293 Kan. 208, 220-21, 262 P.3d 336 (2011).

As we have noted, Taylor brought two negligence claims against Hough. First, she claimed Hough failed to provide adequate facilities to vaccinate and deworm the horses. Second, she claimed Hough failed to warn "of a dangerous condition on the property and in directing [Taylor] to perform a dangerous activity on her premises." We will address both of those arguments.

*Failure to warn of a dangerous condition on the property*

The district court rejected this claim because it found that Taylor had previous experience dealing with wild horses and observed the apparent wild nature of the second batch of horses to be vaccinated and dewormed. Thus, she knew of the wild nature of those horses before voluntarily engaging in the activity that led to her injury. Additionally, the district court found the trailer had no defects, and Taylor knew of the dangers of climbing on the trailer. And the district court also found that nothing

11

prevented Taylor from leaving Hough's property after she became aware of the dangers. Under these circumstances, the district court concluded that Hough had no duty to warn Taylor of a known and obvious danger.

In Kansas, "[a] landowner's duty to both invitees and licensees is one of reasonable care under all the circumstances." *Wrinkle v. Norman*, 297 Kan. 420, 422, 301 P.3d 312 (2013) (citing *Jones v. Hansen*, 254 Kan. 499, Syl. ¶ 2, 867 P.2d 303 [1994]). "This duty includes a duty to warn of a dangerous condition on the property." *Herrell v. National Beef Packing Co.*, 292 Kan. 730, 736, 259 P.3d 663 (2011). The duty is also not limited to physical defects on the land. A landowner can be subject to liability if an invitee suffers physical harm caused by the landowner's failure to carry on his or her activities with reasonable care for the invitees' safety "'if, but only if, [the landowner] should expect that [the invitee] will not discover or realize the danger, or will fail to protect themselves against it.'" *Walters v. St. Francis Hosp. & Med. Center, Inc.*, 23 Kan. App. 2d 595, 598, 932 P.2d 1041 (1997) (quoting Restatement [Second] of Torts § 341A [1964]).

However, a landowner does *not* have a duty to warn of known and obvious dangers. *Tillotson v. Abbott*, 205 Kan. 706, 711, 472 P.2d 240 (1970); see *Wellhausen v. University of Kansas*, 40 Kan. App. 2d 102, 105-06, 189 P.3d 1181 (2008). Courts utilize an objective test when determining whether a danger is known and obvious. *Wellhausen*, 40 Kan. App. 2d at 106 (citing Restatement [Second] of Torts § 343A, comment b [1964]).

Taylor argues the wild nature of the second batch of horses constituted the dangerous condition on Hough's property. In response, Hough contends Taylor's knowledge or lack thereof concerning the demeanor of the horses is immaterial because Taylor had the opportunity to observe the demeanor of the horses prior to attempting to vaccinate and deworm them. Hough also contends the trailer used had no defects and the

risks of climbing on the trailer and attempting to vaccinate and deworm the horses were obvious.

Under an objective standard, we concur with the district court that a reasonable person would know that attempting to administer medication to wild horses constitutes a known and obvious danger. Also, a reasonable person would understand that standing on the fenders of a trailer while attempting to do so compounds the obvious dangers associated with the task.

Additionally, Taylor knew of these dangers personally. In her deposition, she acknowledged the dangers associated with horses, generally, and vaccinating and deworming them, specifically. Even in the first batch of horses, which she contends were less wild, she said they appeared nervous, and one of the horses climbed out of the pen where they were contained. When she observed the second batch of horses, she knew immediately they appeared to be wilder than the first batch. These observations were made before she attempted to administer the vaccines and deworming medicine to the second batch. And she, like a reasonable person would, knew that horses which had not been handled much presented an even greater danger.

*Failure to provide adequate facilities*

Taylor also claimed Hough failed to provide adequate facilities to vaccinate the horses. The district court rejected this claim of negligence for two reasons: (1) Hough owed Taylor no duty to provide a safe working environment because no duty is owed to an independent contractor; and (2) Taylor did not allege the defects on Hough's property contributed to her fall from the trailer.

In *Brillhart v. Scheier*, 243 Kan. 591, 593-94, 758 P.2d 219 (1988), our Supreme Court explained that, if an employer/employee relationship exists between two people,

13

landowners can be held liable under the doctrine of respondeat superior for the negligence of the person working on their land, but landowners generally are not liable to independent contractors who sustain injuries caused by negligence. The difference in liability can largely be explained by the degree of control exerted over the worker. In the respondeat superior context, the employer is liable for the actions of an employee because the employer exerts control over—and maintains responsibility for—the actions of the employee. 243 Kan. at 593. But an independent contractor "represents the will of his employer only in the result, and not as to the means in which it is accomplished. Thus, one who hires such an individual is not liable for that party's negligence. [Citations omitted.]" 243 Kan. at 594.

Typically, the determination of whether a worker is an independent contractor or an employee is a factual question to be determined by the jury or trier of facts. But a court can decide the issue, as a question of law, where the evidence is only susceptible to a single conclusion or the facts are undisputed. *McCubbin v. Walker*, 256 Kan. 276, 281, 886 P.2d 790 (1994) (quoting *Falls v. Scott*, 249 Kan. 54, 64, 815 P.2d 1104 [1991]). In *McCubbin*, our Supreme Court recognized that there is no precise definition of an independent contractor that can be applied in all situations, and each case must be determined based on its own facts. 256 Kan. at 280-81. But, in general terms, our Supreme Court has defined an independent contractor as "'one who, in exercising an independent employment, contracts to do certain work according to his own methods, without being subject to the control of his employer, except as to the results or product of his work.'" 256 Kan. at 280 (quoting *Falls*, 249 Kan. at 64). Put differently:

> "'The primary test used by the courts in determining whether the employer-employee relationship exists is whether the employer has the right of control and supervision over the work of the alleged employee, and the right to direct the manner in which the work is to be performed, as well as the result which is to be accomplished. It is not the actual interference or exercise of the control by the employer, but the existence of

14

the right or authority to interfere or control, which renders one a servant rather than an independent contractor. [Citation omitted.]'" 256 Kan. at 281.

Additionally, our Supreme Court in *McCubbin* stated that "[t]he single most important factor in determining a worker's status as an employee or independent contractor is whether the employer controls, or has the right to control, the manner and methods of the worker in doing the particular task." 256 Kan. at 281.

Here, Taylor's husband, not Hough, devised the method by which he and Taylor would vaccinate and deworm the horses. During his deposition, Taylor's husband testified that, after telling Hough how he planned to vaccinate and deworm the horses, she responded by telling him, "'You do whatever you think you need to do.'" Additionally, Taylor specifically stated she did not go to Hough's residence the day she got hurt in her capacity as Hough's assistant at the veterinary clinic, and both her and her husband acknowledged they could have left Hough's property at any time.

Taylor does not dispute that her husband devised the method they used to vaccinate and deworm the horses. In fact, she does not dispute the district court's conclusion that she met the definition of an independent contractor. Instead, she seems to concede the point but argue that her status as an independent contractor does not preclude recovery. As such, we could normally conclude she has waived any argument to the contrary. See *In re Marriage of Williams*, 307 Kan. 960, 977, 417 P.3d 1033 (2018) (issues not briefed are deemed waived or abandoned).

But under our caselaw there are other factors to consider. In *McCubbin,* our Supreme Court stated there are other "well-recognized and fairly typical indicia of the status of an independent contractor," including:

15

"'the existence of a contract for the performance by a person of a certain piece or kind of work at a fixed price, the independent nature of his business or his distinct calling, his employment of assistants with the right to supervise their activities, his obligation to furnish necessary tools, supplies, and materials, his right to control the progress of the work except as to final results, the time for which the workman is employed, the method of payment, whether by time or by job, and whether the work is part of the regular business of the employer.' [Citation omitted.]" 256 Kan. at 281.

Here, there did not seem to be much discussion concerning payment for completing the work. Taylor said that Hough had paid her husband when he completed work in the past, but Hough did not pay him the day she got injured. Taylor's husband expected to be paid, but he said he had not discussed how much he would be paid. Hough said she had paid some of the people who vaccinated and dewormed the horses, but she also said some people volunteered to do the work and did not ask to be paid. She had previously given one of the workers who did not want to be paid free horse medicine in exchange for performing the work. But regarding Taylor and her husband the day Taylor injured her leg, Hough said, "'I'm sure he knew that I would pay them. But no fee was scheduled or talked about.'"

Moreover, Hough provided the vaccinations and deworming medicine administered to the horses. She also owned the trailer. But Taylor's husband provided the halter used on the first batch of horses. It is not clear who owned the rope used on the second batch of horses, and it does not appear any other tools or materials were used that day.

Taylor focuses her argument on this issue on the district court's second reason for rejecting her claim—that she did not allege the defects on Hough's property contributed to her fall from the trailer. But even if she did make those allegations, the district court was correct when it concluded the alleged defects did not cause Hough to fall and injure

16

her leg. And we agree with the district court that the alleged factual disputes regarding the condition of the fences and gates on Hough's property are not material to the issue.

At most, the alleged defects on Hough's property contributed to the decision to use Hough's trailer to vaccinate and deworm the horses. But the decision to use the trailer came after Taylor had the opportunity to observe and assess the demeanor of the second batch of horses. Taylor's argument that she did not feel like she could stop doing the work is also unconvincing because she acknowledged that she did not go to Hough's property in the capacity of Hough's assistant, and both she and her husband acknowledged they could have left Hough's property at any time.

In sum, we agree with the district court's analysis that Hough had no duty to warn Taylor of what were objectively open and obvious dangers in the task of vaccinating and deworming wild horses. Given Taylor's own knowledge of horses in general and her husband's extensive past experience with horses of all types, it is reasonable to conclude that she assumed the inherent risk of assisting in vaccinating and deworming the horses. This is particularly true given the impromptu use of Hough's trailer in the manner devised by Taylor's husband, which likely heightened the risk of Taylor being injured. This latter fact also lends credence to the district court's conclusion that Taylor's role on the date of the accident was more akin to that of an independent contractor than an employee of Hough, since Taylor was acting completely outside her duties as an assistant at Hough's veterinary practice. Hough had not dictated the manner in which the vaccinating and deworming of the wild horses was to be accomplished; instead, Hough acceded to the task being accomplished in the manner proposed by Taylor's husband.

Likewise, we concur with the district court's conclusion that there was no condition on the property owned by Hough which supports a claim of negligence leading to Taylor's injury. The district court properly determined that Taylor had not demonstrated that any disrepair to fences, gates, and other aspects of the land were

17

material factors leading to the injuries she suffered. Likewise, Taylor conceded that there was no aspect of the horse trailer's condition that posed a hazardous aspect in carrying out the vaccinations and deworming.

The district court did not err in granting summary judgment against Taylor on Hough's first theory of defense. In light of our conclusion on this issue, we find it unnecessary to reach Taylor's appeal of the district court's grant of summary judgment on Hough's second contention, that Taylor's claims are barred by the Domestic Animal Activity Doctrine.

Affirmed.